**2021 UT App 128**

## THE UTAH COURT OF APPEALS

LARRY PETERSON AND GLORIA PETERSON,
Appellants and Cross-appellees,
*v.*
HYUNDAI MOTOR COMPANY, HYUNDAI MOTOR AMERICA,
AND MURDOCK HYUNDAI LLC,
Appellees and Cross-appellants.

Opinion
No. 20190979-CA
Filed November 18, 2021

Fourth District Court, Provo Department
The Honorable Christine S. Johnson
No. 160401657

Trent J. Waddoups, John E. Hansen, and
Bradley W. Madsen, Attorneys for
Appellants and Cross-appellees

Tracy H. Fowler, Paul Shakespear, Annika L. Jones,
Matthew H. Lembke, and Jude S. Halawi, Attorneys
for Appellees and Cross-appellants

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JILL M. POHLMAN concurred.

HARRIS, Judge:

¶1      A fire that started in their carport—where their hybrid Hyundai Sonata (the Car) was parked—destroyed Larry and Gloria Petersons' home and most of its contents. Believing that the fire started as a result of a manufacturing defect in the Car, the Petersons sued Hyundai Motor Company, Hyundai Motor America, and Murdock Hyundai LLC (collectively, Hyundai) for, among other things, negligence and products liability. A jury awarded the Petersons $752,000 in damages, but the trial court refused to add prejudgment interest to that award. In addition,

the court denied Hyundai's motion for judgment as a matter of law, but granted Hyundai's motion for new trial, determining that problems with jury instructions and with the Petersons' expert disclosures warranted a retrial.

¶2     Following entry of the trial court's order granting Hyundai's motion for new trial, the Petersons filed both a notice of appeal and a petition for leave to file an interlocutory appeal. The notice of appeal—purporting to directly appeal from both the new trial order as well as any "subsidiary rulings denying prejudgment interest and attorney fees"—was broader than the petition for interlocutory appeal, which sought leave to challenge only the new trial order. Hyundai, for its part, filed no petition for interlocutory appeal, but did file a notice of cross-appeal purporting to directly appeal from the trial court's order denying its motion for judgment as a matter of law. A panel of this court determined that appellate jurisdiction existed over the direct appeal, but it also granted the Petersons' petition for interlocutory appeal and consolidated the two appeals.

¶3     Upon reconsideration of the jurisdictional question, we conclude that we lack appellate jurisdiction to consider a direct appeal from an order granting a new trial in a civil case, and that we must therefore dismiss both the Petersons' direct appeal—including their challenge to the ruling regarding prejudgment interest—and Hyundai's direct cross-appeal. We proceed to consider the merits of the issue raised in the Petersons' interlocutory appeal: whether the trial court properly granted a new trial. On that issue, we affirm the trial court's order and remand for further proceedings, including a new trial.


BACKGROUND

¶4     On the Monday before Thanksgiving, Larry Peterson woke early to catch a flight to Florida to celebrate the holiday with his daughter. While in the bathroom, Larry noticed the

lights flickering on and off. He quickly woke Gloria and the two went to investigate. Soon they could smell "electrical smoke" and noticed an abnormal light coming from the carport area. As they looked through a window from the house into the carport, they saw "a big fire coming out through the top" of the Car's sunroof. Larry described the fire as not "a normal fire," because it was "like sparklers, like electrical," and "looked like the 4th of July." Gloria called first responders, and the couple only had time to quickly get dressed and grab the family dog before fleeing the home. Firefighters were eventually able to extinguish the blaze, but not before it destroyed the Petersons' home and most of its contents.

¶5     The Petersons had purchased the Car just four months earlier; its entire maintenance history consisted of one oil change a few weeks before the fire. Gloria was the primary driver of the Car and, other than one late-summer trip to Wyoming, the Petersons had used the Car only to travel "around town." The day before the fire—a Sunday—Gloria had driven the Car to church and back, returning for good just after 4:00 p.m. To the best of Gloria's recollection, she had turned the car off before proceeding into the house, although she was not "100 percent" sure about that. But later that night, after dark, the Petersons' son-in-law came over and noticed that several cats were sitting on the car where the windshield met the hood, and he felt the hood and observed that it was warm.

¶6     After the fire, the Petersons learned that the local fire marshal who had investigated the blaze had concluded that the fire had started in the Car, under the hood in the engine compartment. And the Petersons consulted with two other experts—Gary Hodson, a fire investigator, and John Palmer, an electrical engineer—who likewise concluded that the fire had started in the Car, and who in addition concluded that the likely cause of the fire was a manufacturing defect: a high-voltage electrical cable (the Cable) running from the Car's battery to its

engine had been improperly pinched or crushed between the Car's frame and its suspension assembly, causing the Cable's insulation to wear away over time. Eventually, the Petersons sued Hyundai, bringing claims for products liability, negligence, and breach of warranty, and seeking damages for loss of property.

¶7     Just a few weeks after filing their complaint, the Petersons provided initial disclosures to Hyundai. Although at that point the parties were not yet required to disclose even the names of their retained experts, let alone any report from them, *see* Utah R. Civ. P. 26(a)(1), the Petersons produced a copy of "preliminary" reports prepared by both Hodson and Palmer. In Hodson's report, he offered no opinion as to the precise spot in the Car's undercarriage where the Cable had been pinched. But Palmer did: his report included a photograph with a superimposed green arrow indicating precisely "where the [C]able had been crushed." That photograph showed the pinch point being very near a particular bolt hole in the Car's undercarriage; we refer to this potential pinch point as "Point 1."

¶8     After the conclusion of fact discovery, the Petersons formally designated Hodson and Palmer as retained experts, in keeping with the requirements of Utah procedural rules, *see id.* R. 26(a)(4)(C)(i), and stated in that disclosure that both Hodson and Palmer would "testify consistent with [their] preliminary report[s]." Following these expert disclosures, Hyundai opted to take depositions of Hodson and Palmer rather than require them to submit more complete reports. *See id.* R. 26(a)(4)(B).

¶9     During Hodson's deposition, he offered specific opinions that the fire had started inside the Car and was caused by the Cable having been pinched or crushed. But Hodson was not asked to—and did not—identify the precise point at which the Cable was pinched, stating only generally that it had been pinched somewhere in "the lower frame area," a nonspecific

area that Hodson stated was depicted in a series of eleven different photographs attached to his report.[1] At the conclusion of his deposition, Hodson was asked if, during the deposition, he had "given [Hyundai] all of the opinions that [he] expect[ed] to testify to at trial," and he answered in the affirmative.

¶10 During Palmer's deposition, he likewise offered specific opinions that the fire started inside the Car and was caused by the Cable being pinched or crushed. He also opined that the Cable had been energized at the time the fire started, although he could not definitively say how that came to be; in his view, either Gloria had left the Car on when she came home from church, or the safety systems built into the Car had malfunctioned. Palmer, like Hodson, was not directly asked about the precise location where the Cable had been pinched; he was, however, asked whether "the entire sheath [was] pinched, . . . or just the [C]able," and he responded by

---

1. Hyundai acknowledges that Hodson was never directly asked to identify the precise pinch point, but asserts that Hodson indirectly identified it by referring to two photographs as showing "the path of the [C]able into the [frame]" of the Car. In our view, Hyundai is reading too much into Hodson's deposition testimony. As an initial matter, the question pending at the time of Hodson's statements about the two specific photographs had to do with his general opinion "that the fire started in the vehicle," and not about the precise location of the pinch point. In this context, Hodson offered only a general statement that the Cable was pinched "in the lower frame area," which area was shown, from different angles, in a series of eleven photographs. And more to the point, Hodson's identification of a part of the "path of the [Cable]" does not amount to specific identification of the point at which the Cable was pinched, especially when that statement is viewed in context.

stating that "[t]he entire assembly" was pinched, and volunteered that when he looked at the undercarriage of the Car, he "could see the [C]able goes right up to this frame member and comes out the other side," and that he "took the nut off, opened it up, and lo and behold here it was." He referred to a "mark on the frame" and on "the lower arm," and stated that "[r]ight in there is where it was," but the record does not reveal whether Palmer was referring to any specific diagram or photograph during that portion of his testimony. At the conclusion of his deposition, Palmer was asked whether he had "expressed all of the opinions today that [he expected] to express at trial," and he stated that "[n]othing else comes to mind right now" and "obviously my report contains a lot of the information we've already discussed" but that he could not "think of anything that's in the report that we haven't already discussed."

¶11 To rebut the opinions of Hodson and Palmer, Hyundai designated engineer Jeff Colwell as an expert witness. Colwell prepared a report setting forth his conclusions; Hyundai provided that report to the Petersons, in lieu of a deposition. In his report, Colwell opined that the Car was not the cause of the fire, and that the fire had instead been the result of one of several other potential causes, although he could not say which one. In particular, Colwell took issue with Hodson's and Palmer's conclusion that the fire had been caused by the Cable being pinched, specifically opining that the Cable could not have been "crushed in the location [Point 1] in which [Palmer] alleges the fault occurred" because that location was too far away from where the Cable was routed. He also opined that the Cable could not have been energized at the time of the fire, and therefore could not have caused the fire in any event.

¶12 Some nine months after issuance of Colwell's report, the case proceeded to a five-day jury trial. The Petersons called eight witnesses to support their case, including themselves as well as Hodson, Palmer, and the local fire marshal. The bulk of the

Petersons' damages evidence came in through Gloria. With regard to the value of the damaged real property, Gloria testified about certain cost estimates that had been obtained regarding the repair of their home, and that, in her view as a property owner, the home had been worth more than the repair cost estimates. With regard to the value of the damaged personal property, the Petersons offered into evidence a spreadsheet detailing some 1,500 items that had been damaged or destroyed, their respective replacement values, and an estimate regarding each item's depreciation prior to the fire. While Gloria had provided some of the information used to create the spreadsheet, she had not prepared it and testified only briefly about it, stating that some of the items on the list were "not entirely accurate" but were the "best estimate" she knew of, and that she had "no idea" where the depreciation figures came from. The Petersons called no expert to testify about the computation of their claimed damages.

¶13   Hodson testified on the second day of trial. During his testimony, as he did at his deposition, Hodson opined that the fire had started in the Car, and that its origin could be traced to the pinched Cable. This time, though, Hodson identified a particular location as the pinch point: a spot near a different bolt hole than the one Palmer had identified in his report. We refer to this potential pinch point as "Point 2." During the testimony, Hyundai lodged no objection to Hodson's identification of the pinch point; Hyundai later explained that, in the moment, it did not realize (due to the configuration of the photographs to which Hodson was pointing) that Hodson was identifying a different pinch point than Palmer had identified in his report.

¶14   Later that evening, after court had adjourned for the day, the Petersons' counsel emailed to Hyundai's counsel a set of PowerPoint slides that Palmer planned to use during his trial testimony, which was scheduled for the following day. When Hyundai examined those slides, it realized that Palmer intended

to testify that the pinch point was actually Point 2, and not Point 1 as his report indicated. That evening, a Hyundai attorney drafted a "bench brief" regarding Palmer's "changed and undisclosed expert opinions," which Hyundai presented to the court and to the Petersons' counsel when court reconvened the next morning. In that brief, as well as orally, Hyundai asked the trial court to bar Palmer from testifying, or at least limit his testimony by preventing him from opining that the pinch point was at Point 2. Hyundai asserted that Palmer's Point 2 opinion had not been previously disclosed and contradicted an opinion Palmer had set forth in his report.

¶15   In response, the Petersons' counsel acknowledged that Palmer had attached the wrong photograph (the one identifying the pinch point location as Point 1) to his report, but characterized Hyundai's argument as "a straw man" and asserted that Colwell had known all along where the true pinch point was because he had been present during disassembly of the Car and had seen it for himself. The trial court accepted the Petersons' representation that Colwell had been present during disassembly and had seen the actual pinch point, and on that basis, despite concluding that there had "been some misleading testimony about which bolt hole was at issue," the court substantially denied Hyundai's motion and allowed Palmer to testify that Point 2 was the actual pinch point location.

¶16   Thereafter, Palmer took the stand and, as he did at his deposition, opined that the fire had started in the Car, and had been caused by the Cable being pinched. This time, though, he testified that the Cable was pinched at or near Point 2. He explained that this opinion was different from what had been expressed in his report because he "put the wrong picture in [his] report." Palmer also opined that the Cable had been energized at the time of the fire, and listed reasons for that opinion, although he could not say "precisely what led to the [C]able being energized." On cross-examination, when asked

why he did not have a photograph of the Cable stuck in the pinch point, Palmer acknowledged that the Cable had "come loose" due to fire damage and had "come out of the pinch point" before disassembly of the Car, and that therefore none of the experts, including Colwell, had been able to actually observe the Cable in its pinched state.

¶17   Immediately following Palmer's direct examination, and outside the presence of the jury, the trial court, sua sponte, stated that it was "not really happy with the direction that this has taken," and offered its view that the Petersons should have supplemented their disclosures as soon as they learned that Palmer had attached the wrong photograph to his report and that he intended to offer testimony inconsistent with that photograph. The Petersons' counsel, in response, proffered that the Petersons' litigation team had learned of the error only "last week as [they were] preparing for trial." Discussion about the issue continued at the conclusion of the Petersons' case, when Hyundai not only asked for a directed verdict on the merits of the Petersons' claims but also renewed its motion to exclude all or part of Palmer's testimony, this time styled as a motion to strike. Hyundai argued that the Petersons had not disclosed Palmer's Point 2 opinion until the day before Palmer testified, and asserted that "in so doing, [the Petersons] severely prejudiced" Hyundai. The court denied Hyundai's motion for directed verdict, but granted in part Hyundai's motion to strike, determining that because of the Petersons' late disclosure of Palmer's Point 2 opinion "it's appropriate to strike Dr. Palmer's testimony with respect to the routing of the [C]able." The court indicated that it would give the jury a "supplemental jury instruction[]" to that effect when the time came to instruct the jury. Hyundai later asked the court to include within its instruction a command to disregard not only Palmer's testimony about the pinch point, but Hodson's as well; the court declined that invitation, although it stated that Hyundai was free to argue

that, "to the extent" Hodson was merely "previewing" Palmer's testimony, then Hodson's testimony is "equally flawed."

¶18 In Hyundai's presentation of its case to the jury, it called two witnesses, including Colwell, who offered his opinions that the Car could not have been the cause of the fire; that there was no defect in the Cable; and that, even if there had been, it could not have started the fire because it had not been energized at the time the fire started.

¶19 After all evidence had been presented, the court instructed the jury. With regard to Palmer, the court gave the following specific instruction: "The testimony of Dr. Palmer regarding the routing of the high-voltage [C]able and the placement of the alleged fault point is stricken. You are instructed . . . to disregard that portion of Dr. Palmer's testimony."

¶20 At the outset of the case, the court had given a general instruction regarding the "preponderance of the evidence" burden of proof that applies in civil cases. That instruction, taken directly from the Model Utah Jury Instructions (MUJI),[2] explains what "preponderance of the evidence" means, but that introductory instruction—unlike its criminal counterparts[3]—

---

2. *See* Model Utah Jury Instructions 2d CV117 (2018), https://www.utcourts.gov/resources/muji/inc_list.asp?action=showRule&id=1#117 [https://perma.cc/L6FD-LWS9].

3. *See id.* CR102, https://www.utcourts.gov/resources/muji/inc_list.asp?action=showRule&id=29#102 [https://perma.cc/8WVF-SQQC] (stating that "[t]he prosecution must prove each element beyond a reasonable doubt" and that "[t]he defendant does not have to prove anything"); *id.* CR103, https://www.utcourts.gov/resources/muji/inc_list.asp?action=sh

(continued…)

does not mention which party bears the burden; instead, it states simply that "the party" with the burden of proof "must persuade you, by the evidence, that the fact is more likely to be true than not true." And the specific MUJI instructions that set forth the elements of negligence and strict liability in the products liability context—unlike many other MUJI instructions, including the MUJI elements instruction in the general negligence context[4] and the MUJI elements instruction for breach of warranty in the products liability context[5]—likewise do not specify which party bears the burden of proof; instead, those instructions state simply that the jury "must decide whether" the elements of the claim are met.[6] With this in mind, Hyundai had asked that specific language be added to these two MUJI

---

(…continued)
owRule&id=29#103 [https://perma.cc/274B-PMFS] ("The prosecution has the burden of proving the defendant guilty beyond a reasonable doubt.").

4. *See id.* CV202A, https://www.utcourts.gov/resources/muji/inc_list.asp?action=showRule&id=2#202A [https://perma.cc/AE47-L3SQ] (stating that, "[t]o establish negligence, [name of plaintiff] has the burden of proving" several elements).

5. *See id.* CV1028, https://www.utcourts.gov/resources/muji/inc_list.asp?action=showRule&id=10#1028 [https://perma.cc/WM55-RA3C] (stating that, to establish a claim of breach of express warranty in the products liability context, "[name of plaintiff] must prove" several elements).

6. *See id.* CV1002, https://www.utcourts.gov/resources/muji/inc_list.asp?action=showRule&id=10#1002 [https://perma.cc/85PU-7HY7]; *id.* CV1016, https://www.utcourts.gov/resources/muji/inc_list.asp?action=showRule&id=10#1016 [https://perma.cc/J2HY-526X].

elements instructions in order to make clear that the Petersons—and not Hyundai—bore the burden of proof on those claims. The court—as trial judges often do—took refuge in MUJI, and denied Hyundai's request; rather, the court determined to simply give the instructions as they appear in MUJI, stating that it thought that "the MUJI instructions address [the burden of proof] properly," even though "it's not all encapsulated in one instruction." The court also declined to use Hyundai's proposed special verdict form—which would have specified that the Petersons bore the burden of proof on their claims—and instead gave the jury a different special verdict form that did not so specify.

¶21 Several days earlier, during his opening statement, Hyundai's counsel—perhaps due to his awareness of the jury instructions' failure to speak to the topic—stated that he wanted

> to pause and emphasize one thing that you heard in the judge's preliminary jury instructions. There's a burden of proof that's important to keep in mind in this case, and all of the things you just heard [the Petersons'] counsel say that they intend to prove to you, they have the burden to persuade you that that's true by a preponderance of the evidence.

During closing arguments, which took place immediately after the post-evidence jury instructions were given, Hyundai's counsel again emphasized that the Petersons bore the burden of proof, stating specifically that it was the Petersons' "burden to prove that there's a defect. It's their burden to prove that that defect was unreasonably dangerous. It's their burden to prove that that defect caused this fire."

¶22 Following closing arguments, the jury deliberated until almost midnight. Eventually, the jury returned a verdict in favor of the Petersons on the strict liability and negligence claims, but in favor of Hyundai on the breach of warranty claim. The jury

awarded the Petersons $752,000: $368,000 for damage to their house, and $384,000 for damage to their personal property.

¶23 Following the verdict, both parties sought additional relief from the court. The Petersons filed a motion and a proposed judgment that asked the court to add prejudgment interest to the jury's award of damages, asserting that their losses were "fixed in time" and quantifiable through mathematical computation, and therefore eligible for prejudgment interest. The trial court denied the Petersons' motion and refused to award prejudgment interest, concluding that "[t]he jury did not use a formula put forward by either party, but used its own judgment" to calculate damages.

¶24 For its part, Hyundai filed a motion "for judgment as a matter of law or, in the alternative, for a new trial." In arguing for judgment notwithstanding the verdict, Hyundai asserted (among other things) that the Petersons had produced insufficient evidence to show that any manufacturing defect— even if one were presumed to have existed—had caused the fire, claiming that insufficient evidence existed to support the contention that the Cable had been energized at the time of the fire. In arguing for a new trial, Hyundai asserted that the admission of Hodson's and Palmer's Point 2 opinions, as well as infirmities in the jury instructions, required a retrial. The trial court, after reviewing voluminous briefing and holding oral argument, denied Hyundai's motion for judgment as a matter of law, concluding that the Petersons' evidence "provided a legally sufficient basis for the jury to find that there was a defect in the [Car] . . . and that such defect caused the fire."

¶25 But the court granted Hyundai's motion for new trial. With regard to the expert disclosure and testimony issue, the court concluded that "the trial testimony offered by [Palmer] and [Hodson] differed from the opinions disclosed in their respective written reports as well as the testimony offered at

deposition," and that any new opinion should have been timely disclosed and was not. The court offered its view that the Petersons' actions during trial gave "all the appearances of an ambush," and that the court's "curative instruction" striking Palmer's testimony had not effectively remedied the problem. And with regard to the jury instructions, the court stated that it had "placed its faith in MUJI," but concluded upon reconsideration that the MUJI instructions regarding negligence and strict liability in the products liability context contained a lacuna: they did not inform the jury that the Petersons bore the burden of proof on those claims.

¶26  Following entry of the trial court's order granting Hyundai's motion for new trial, the Petersons filed both a notice of appeal—purporting to directly appeal—and a petition for interlocutory appeal. In their notice of appeal, the Petersons stated that they were challenging the trial court's order granting Hyundai's motion for new trial, as well as certain "subsidiary rulings denying prejudgment interest and attorney fees." In their petition for interlocutory appeal, the Petersons asked for leave to appeal only from the trial court's order granting Hyundai's motion for new trial; their petition made no mention of attempting to challenge any other orders, including the court's order denying their request for prejudgment interest. Later, Hyundai filed a notice of cross-appeal, purporting to directly appeal from the trial court's order denying its motion for judgment as a matter of law. Hyundai did not seek leave to file an interlocutory appeal.

¶27  This court issued a sua sponte motion for summary disposition of the direct appeal, positing that the court may not have appellate jurisdiction due to absence of finality at the district court level. After considering briefing from the parties, a panel of this court—in an unpublished interim order, and relying on *Kerr v. City of Salt Lake*, 2013 UT 75, ¶¶ 35–37, 322 P.3d 669—concluded that "[t]his matter is appropriate as a direct

appeal, as a matter of right," but in an abundance of caution granted the petition for interlocutory appeal and consolidated the two appeals.

ISSUES AND STANDARDS OF REVIEW

¶28    On appeal, the parties present three issues for our review. First, the Petersons challenge the trial court's grant of Hyundai's motion for new trial. Second, the Petersons challenge the court's denial of their own motion for prejudgment interest. And third, Hyundai challenges the court's denial of its motion for judgment as a matter of law. The Petersons' petition for interlocutory appeal raised only the first of these issues; the other two issues were identified only in the direct appeal and cross-appeal.

¶29    While a panel of this court, earlier in this appellate case, determined that we have jurisdiction to consider a direct appeal under these circumstances, we now conclude otherwise. The first part of our opinion discusses our appellate jurisdiction, and our consideration of this issue is plenary. *See Trapnell & Assocs., LLC v. Legacy Resorts, LLC*, 2020 UT 44, ¶¶ 29, 31, 469 P.3d 989 (explaining that appellate courts "have an independent obligation to ensure [they] have jurisdiction over all matters before [them]," and stating that evaluating the scope of our appellate jurisdiction "presents a question of law"); *Zion Village Resort LLC v. Pro Curb USA LLC*, 2020 UT App 167, ¶ 50, 480 P.3d 1055 ("We have an independent obligation to assess our own appellate jurisdiction at any time . . . ." (quotation simplified)).

¶30    Because we conclude that we lack jurisdiction over the direct appeal, the only issue we must confront on its merits is the one raised in the interlocutory appeal: the Petersons' challenge to the court's order granting a new trial. Generally speaking, "[a] trial court's decision to grant or deny a motion for a new trial is reviewed for an abuse of discretion." *See Clayton v. Ford Motor Co.*, 2009 UT App 154, ¶ 5, 214 P.3d 865. But there are two

aspects to a court's decision-making process in ruling on a motion for new trial, and there are differences in the manner in which we review each aspect.

¶31 First, a trial court must determine that there exists a problem—an error of law, say, or a trial impropriety—that may require a retrial. Under our rules of civil procedure, "a new trial may be granted" for any one of seven enumerated reasons, *see* Utah R. Civ. P. 59(a), and some of these listed grounds—for instance, jury misconduct, unfair surprise, and excessive or inadequate damages—cannot be found to exist without some sort of factual determination on the part of the trial court. In this context, we afford deference to a trial court's factual determinations. *See, e.g., ASC Utah, Inc. v. Wolf Mountain Resorts, LC*, 2013 UT 24, ¶ 22, 309 P.3d 201 ("The district judge who presided over a trial is in a far better position than an appellate court to determine, for example, whether the evidence was sufficient to justify the verdict or whether the jury awarded damages 'under the influence of passion or prejudice.'" (quoting Utah R. Civ. P. 59(a)(5)–(6))); *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 83, 372 P.3d 629 (discussing the standard of review on motions for new trial and explaining that where the motion implicates a legal question we review for correctness, but for "evidentiary question[s], we review for abuse of discretion"). Other grounds—for instance, the existence of legal errors, *see* Utah R. Civ. P. 59(a)(7)—require no factual determination on the part of the trial court, and we review such determinations for correctness, *see ASC Utah*, 2013 UT 24, ¶ 23 (stating that a trial court "is not necessarily in a better position than an appellate court to identify its own errors of law," and that "we review an appellant's allegations of legal error under URCP 59(a)(7) for correctness"), but we have often stated that a trial court abuses its discretion when it makes a legal error, *see, e.g., State v. De La Rosa*, 2019 UT App 110, ¶ 4, 445 P.3d 955 (stating that "trial courts do not have discretion to misapply the law" (quotation simplified)); *Maak v. IHC Health Services, Inc.*, 2016 UT App 73,

¶ 26, 372 P.3d 64 ("The [trial] court abuses its discretion when its decision rests on an erroneous legal determination.").

¶32   Second, after determining that an error or impropriety of some kind exists, a trial court must determine whether the identified errors or improprieties are significant enough to warrant a retrial. Indeed, rule 59 is, by its terms, "limited by Rule 61," the rule discussing harmless error. *See* Utah R. Civ. P. 59(a); *id.* R. 61 (stating that courts are to "disregard any error or defect in the proceeding which does not affect the substantial rights of parties"); *see also Camco Constr. Inc. v. Utah Baseball Academy Inc.*, 2018 UT App 78, ¶ 59, 424 P.3d 1154 (stating that the rule granting new trials is "subject to the provisions of Rule 61" (quotation simplified)). Sometimes, a trial impropriety's harmfulness will be self-evident; for instance, a finding that the jury's damages award was excessive and given under the influence of passion or prejudice may naturally encompass a determination that the problem mattered. But in other situations—say, jury misconduct or legal error—it will not follow, simply from the existence of an impropriety, that a new trial is warranted. In such situations, a trial court must undertake a second analytical step, and must assess whether the error or impropriety was significant enough to warrant a retrial. *See ASC Utah*, 2013 UT 24, ¶ 23 (stating that new trials should be granted for legal errors only where "the error resulted in prejudice necessitating a new trial" (quotation simplified)). And on this score, we afford deference to a trial court's determination, reviewing only for abuse of discretion. *See De La Rosa*, 2019 UT App 110, ¶¶ 5, 9 (stating that a trial court's assessment of "whether the jury misconduct in the present case merited a new trial" is "inherently difficult for appellate courts to second guess," and that such questions are "entirely within the discretion of the trial court due to its advantaged position to judge the impact of legal errors on the total proceedings" (quotation simplified)); *see also State v. Maestas*, 2012 UT 46, ¶ 325, 299 P.3d 892 ("Trial courts have discretion in granting or

denying a motion for a mistrial . . . because of [their] advantaged position . . . to determine the impact of events occurring in the courtroom on the total proceedings . . . ." (quotation simplified)).

ANALYSIS

¶33    We begin, in the first section, by evaluating the scope of our appellate jurisdiction and conclude that, although we have jurisdiction to address the Petersons' interlocutory appeal, we lack jurisdiction over the Petersons' direct appeal and Hyundai's direct cross-appeal. In the second section, we address the merits of the issue raised in the Petersons' interlocutory appeal, namely, whether the trial court properly granted a new trial.

## I. Appellate Jurisdiction

¶34    As a general matter, litigants dissatisfied with a trial court's ruling are allowed to appeal only after the court has completely resolved the case and its judgment has become final. *See* Utah R. App. P. 3(a)(1) ("Except as otherwise provided by law, a party may appeal a final order or judgment . . . ."). A "final judgment" is a court decision that "end[s] the controversy between the litigants." *See Loffredo v. Holt*, 2001 UT 97, ¶ 12, 37 P.3d 1070; *see also* Utah R. Civ. P. 54(a) ("'Judgment' . . . includes a decree or order that adjudicates all claims and the rights and liabilities of all parties or any other order from which an appeal of right lies."). In other words, for a judgment to be considered "final," the subject of the litigation must be fully disposed of on the merits for all the claims and all the parties. *See Mike's Smoke, Cigar & Gifts v. St. George City*, 2015 UT App 158, ¶ 8, 353 P.3d 626. This "final judgment rule" is "jurisdictional." *Powell v. Cannon*, 2008 UT 19, ¶ 12, 179 P.3d 799. That is, our jurisdiction is limited to appeals taken from a final judgment, unless the appeal

"qualifies for an exception to the final judgment rule."[7] *Loffredo*, 2001 UT 97, ¶ 10. If, after entry of the order or judgment in question, "any issue remains pending, the final judgment rule is not satisfied." *See American Family Ins. v. S.J. Louis Constr., Inc.*, 2015 UT App 115, ¶¶ 6–7, 349 P.3d 772 (quotation simplified).

¶35 An "order granting a new trial is not a final judgment," because "it but sets aside the verdict and places the parties in the same [legal] position as if there had been no previous trial." *Haslam v. Paulsen*, 389 P.2d 736, 736 (Utah 1964); *see Dalton v. Herold*, 934 P.2d 649, 650 (Utah 1997) (stating that "the grant of a motion for a new trial" is not immediately appealable "because it is not a final judgment"). After a new trial has been ordered, the case is nowhere near finished: there remain issues still to be adjudicated in the new trial. *See Kerr v. City of Salt Lake*, 2013 UT 75, ¶ 37, 322 P.3d 669. Many orders that grant a new trial—the ones that nullify a jury verdict—are eventually subject to appellate review, but not until *after* the trial court finishes its work and finally adjudicates the remaining issues, which may not be until after the retrial is complete. *See Stubbs v. Third Jud. Dist.*, 150 P.2d 783, 785 (Utah 1944); *see also Kerr*, 2013 UT 75, ¶¶ 36–37.

¶36 The Petersons take a different view, and rely principally on *Kerr* to support their position. But the Petersons' reliance on *Kerr* is misplaced. The question presented in that case was

---

7. Our supreme court recognizes three categories of exceptions to the final judgment rule: (1) exceptions set forth in statute, (2) orders properly certified as final under rule 54(b) of the Utah Rules of Civil Procedure, and (3) interlocutory appeals for which permission has been obtained pursuant to rule 5 of the Utah Rules of Appellate Procedure. *See Copper Hills Custom Homes, LLC v. Countrywide Bank, FSB*, 2018 UT 56, ¶¶ 12–15, 428 P.3d 1133.

whether a trial court ruling granting a new trial after a directed verdict was reviewable at all, or whether that decision—like trial court decisions denying summary judgment motions on the basis that there exists a material factual dispute—was not ever subject to appellate review. *See Kerr*, 2013 UT 75, ¶ 34 (stating that the question at hand was "whether an appellate court may review an order granting a new trial where a jury did not enter a verdict in the first trial"). In *Kerr*, the first trial came to an end when the court granted a motion for a directed verdict, but it later—after the losing party filed a motion for a new trial—determined that its directed verdict had been mistaken and ordered a new trial. *See id.* ¶¶ 7–8. No party mounted an appeal at that point; instead, the case proceeded to a second trial, where the case came out differently: the party against whom directed verdict was entered in the first trial prevailed before a jury at the second trial. *Id.* ¶¶ 9–10. Only after the second trial ended, and a final order was entered, did anyone attempt to seek appellate review of the trial court's original order granting a new trial. *Id.* ¶ 10.

¶37  On appeal, all the justices agreed that an order granting a new trial after a jury verdict is (eventually) subject to appellate review, *id.* ¶¶ 36, 55, but the majority determined that an order granting a new trial that did not nullify a jury verdict was—like an order denying a summary judgment motion on the basis that there exists a material factual dispute—never subject to appellate review, *id.* ¶¶ 35–37. There is no suggestion in *Kerr* that an order granting a motion for new trial is a final order, or that such an order is appealable right away, before the newly ordered retrial has been completed. *See generally id.* Indeed, the cases cited in *Kerr* supporting the proposition that an order granting a new trial is appealable were all cases in which the appeal was not filed until *after* the second trial. *See id.* ¶ 36 (collecting cases). And, as noted, that was the procedural posture of *Kerr* itself.

*See id.* ¶ 10. Thus, *Kerr* (and the cases cited therein) stands for the proposition that, in civil cases,[8] a trial court's order granting a motion for new trial is (eventually) subject to appellate review—at least where the order nullifies the result of a jury trial—but that any appeal of such an order must take place, if at all, only *after* the second trial is finished and the case has become final.

¶38    We therefore conclude that the trial court's order granting Hyundai's motion for new trial was not a final order, and was not appealable as a matter of right in a direct appeal. Thus, the Petersons' attempt to mount a direct (as opposed to an interlocutory) appeal from that order is unavailing, as is Hyundai's attempt to mount a direct cross-appeal from other aspects of that same order. Direct appellate review of that order, and of any other non-final orders entered in the case, will need to await the entry of a final judgment disposing of all the claims made by all the parties. *See* Utah R. App. P. 3(a); *see also Mike's Smoke*, 2015 UT App 158, ¶ 8.

¶39    We do, however, have appellate jurisdiction to consider interlocutory appeals approved pursuant to rule 5 of the Utah Rules of Appellate Procedure. *See Copper Hills Custom Homes, LLC v. Countrywide Bank, FSB*, 2018 UT 56, ¶ 14, 428 P.3d 1133

---

8. The situation is different in criminal cases, but not because such orders are final; the difference arises only because our legislature has created a statutory exception to the final judgment rule authorizing prosecutors, "as a matter of right," to "appeal from . . . an order granting a new trial." *See* Utah Code Ann. § 77-18a-1(3)(f) (LexisNexis Supp. 2021); *see also Copper Hills*, 2018 UT 56, ¶ 13 (stating that there is an "exception to the final judgment rule" in situations where "the legislature provides a statutory avenue for appealing nonfinal orders" (quotation simplified)). As far as we are aware, no such statutory exception exists in civil cases.

(stating that interlocutory appeals are an "exception" to the final judgment rule, but noting that such appeals are "discretionary," "meaning that the appellate court has the discretion to hear the appeal as it is not an appeal as a matter of right"). Earlier in this case, we approved the Petersons' request to bring an interlocutory appeal from the trial court's order granting a new trial, and no party asks us to revisit that grant of approval. But the Petersons' request for interlocutory appeal was narrower than their direct appeal, asking us to review only the trial court's order granting a new trial. In that request, the Petersons did not ask for permission to take an interlocutory appeal from any other non-final order, such as the trial court's order refusing to add prejudgment interest to the judgment amount. And although the trial court's decision regarding its motion for judgment as a matter of law was set forth in the same order from which the Petersons were attempting to interlocutorily appeal, Hyundai did not file its own request for interlocutory review of that order.[9]

¶40    Our appellate jurisdiction is therefore limited to review of the Petersons' interlocutory appeal, and that appeal in turn is limited to review of only the trial court's decision to grant Hyundai's motion for new trial. *See Houghton v. Department of Health*, 2005 UT 63, ¶ 16, 125 P.3d 860 ("On interlocutory appeal, we review only those specific issues presented in the petition.").

---

9. Although interlocutory cross-appeals were once allowed, *see Gunn Hill Dairy Props., LLC v. Los Angeles Dep't of Water & Power*, 2012 UT App 20, ¶¶ 17–24, 269 P.3d 980, they are no longer permitted under our rules, *see* Utah R. App. P. 5(i) ("A cross-petition for permission to appeal a non-final order is not permitted by this rule."). If Hyundai had wanted to seek interlocutory review of those portions of that order that were decided adverse to its requests, it would have had to file its own petition for permission to file an interlocutory appeal. *See id.*

We have no appellate jurisdiction, at this point, to entertain either party's direct appeal, including their attempts to appeal from the trial court's order regarding prejudgment interest[10] or denying Hyundai's motion for judgment as a matter of law. We therefore dismiss the direct appeal for lack of jurisdiction, and proceed to consider the merits of the Petersons' interlocutory appeal.

## II. The Grant of a New Trial

¶41    We now turn to the merits of the issue properly before us on interlocutory appeal: the Petersons' challenge to the trial court's order granting a new trial.[11] In that order, the court identified two separate trial-related improprieties that it believed warranted a retrial. We first assess the court's determination that these trial improprieties existed, and conclude that they did. Next, we assess whether the identified problems were, viewed collectively, prejudicial enough to warrant a new trial; on that

---

10. We cannot consider the Petersons' challenge to the trial court's prejudgment interest order for jurisdictional reasons. In addition, however, we note that the Petersons' damages evidence may be presented differently in a second trial, and given our affirmance (discussed *infra* Part II) of the trial court's order granting a new trial, it makes practical—as well as jurisdictional—sense to wait to assess the propriety of adding prejudgment interest to any award the Petersons might win at a second trial.

11. As part of this challenge, the Petersons also raise various procedural arguments, claiming that Hyundai did not properly invoke rule 59 of the Utah Rules of Civil Procedure and that the court overstepped its bounds by injecting new matters into the proceedings. We consider these arguments without merit and do not discuss them further.

score, we perceive no abuse of discretion in the trial court's order.

## A.    Trial Improprieties

¶42    In its order granting a new trial, the court determined that two separate problems had arisen during trial. First, the court concluded that the opinions Hodson and Palmer offered at trial that the Cable had been pinched near Point 2 had not been disclosed to Hyundai prior to trial; that the Petersons' failure to disclose these opinions earlier violated expert disclosure rules; and that those opinions should have therefore been excluded. Second, the court concluded that some of the jury instructions it had given were incorrect, and failed to communicate to the jury the fact that the Petersons bore the burden of proof on all their claims. We discuss each of these problems, in turn.

### 1.    Expert Disclosures

¶43    The trial court determined that the Petersons—by failing to disclose to Hyundai until after the trial's second day that their experts would testify that the Cable was pinched near Point 2— violated our rules of civil procedure regarding expert witness disclosures, and that those new expert opinions should have been excluded. Whether the Petersons' disclosures violated the rules presents, at root, a question of interpretation of our rules of civil procedure. "The proper interpretation of a rule of procedure is a question of law, and we review the trial court's decision for correctness." *Ostler v. Buhler*, 1999 UT 99, ¶ 5, 989 P.2d 1073. Whether exclusion of testimony is the proper sanction for a rules violation is a matter upon which we defer to the trial court. *See VT Holdings LLC v. My Investing Place LLC*, 2019 UT App 37, ¶ 18, 440 P.3d 767 (stating that trial courts "have broad discretion in selecting and imposing sanctions for discovery violations under rule 26, such as the exclusion of expert testimony, and we will not interfere with such discretion unless

there is either an erroneous conclusion of law or no evidentiary basis for the trial court's ruling" (quotation simplified)).

¶44 Under our rules, parties must disclose certain information regarding retained expert witnesses. *See* Utah R. Civ. P. 26(a)(4)(A). These disclosures must occur long before trial, generally just days after fact discovery has been completed, *see id.* R. 26(a)(4)(C), and they must include "a brief summary of the opinions to which the witness is expected to testify," as well as "the facts, data and other information specific to the case that will be relied upon by the witness in forming those opinions," *id.* R. 26(a)(4)(A). Upon receiving expert disclosures from an opposing litigant, a party may seek further information from the expert "either by deposition or by written report." *See id.* R. 26(a)(4)(B). If a party requires the expert to prepare a report, that report "must contain a complete statement of all opinions the expert will offer at trial and the basis and reasons for them." *Id.*; *see also Arreguin-Leon v. Hadco Constr. LLC*, 2018 UT App 225, ¶ 21, 438 P.3d 25 ("The election of a report locks in the scope of the expert's testimony by operation of the rule itself . . . ."), *aff'd*, 2020 UT 59, 472 P.3d 927. If a party elects to take the expert's deposition, "it is up to the party deposing the expert to 'lock in' the expert's opinion," and the expert "is bound by the testimony" given in a deposition. *See Arreguin-Leon*, 2018 UT App 225, ¶ 21.

¶45 Rule 26 imposes a duty on all parties to supplement their expert disclosures, if necessary, as the lawsuit proceeds. Indeed, "[i]f a party learns that a disclosure . . . is incomplete or incorrect in some important way, the party must timely serve on the other parties the additional or correct information if it has not been made known to the other parties." Utah R. Civ. P. 26(d)(5); *see also Dahl v. Dahl*, 2015 UT 79, ¶ 71, 459 P.3d 276 ("Parties must supplement only if they discover their initial responses were incomplete or incorrect in some important way and that the corrective information was not already known to the other

party." (quotation simplified)). A party who fails to meet its disclosure obligations, including its obligation to seasonably supplement those disclosures, faces the probability of having its expert witness barred, in whole or in part, from testifying at trial. *See* Utah R. Civ. P. 26(d)(4) (stating that "[i]f a party fails to . . . supplement timely a disclosure" when the duty is present, the party may not later use the "document or material at any hearing or trial unless the failure is harmless or the party shows good cause for the failure"); *see also Arreguin-Leon*, 2018 UT App 225, ¶ 21 ("[T]he party sponsoring the expert remains responsible, under penalty of exclusion of testimony, to supplement any disclosures or discovery responses previously made—including responses given in a deposition." (quotation simplified)).

¶46    These rules, taken together, provide that a retained expert witness generally may not testify at trial regarding matters not "fairly disclosed" to the other side prior to trial. *See* Utah R. Civ. P. 26(a)(4)(B) ("[A]n expert may not testify in a party's case-in-chief concerning any matter not fairly disclosed in the report."); *see also Arreguin-Leon*, 2018 UT App 225, ¶ 21 (stating that an "expert witness is bound by the testimony she gives in a deposition"). Indeed, "the intent of rule 26 . . . is to preclude parties from trying to gain an advantage by offering 'surprise' testimony at trial that has not been disclosed to, or evaluated by, the opposing party." *Arreguin-Leon*, 2018 UT App 225, ¶ 24.

¶47    In this case, the trial court correctly determined that the Petersons had violated their duty to supplement their disclosures regarding Palmer's expert opinions. When the Petersons designated Palmer as a testifying expert, they provided a preliminary report that included a picture of the Car's undercarriage with a superimposed arrow identifying Point 1 as the location "where the [C]able had been crushed." Hyundai then elected to depose Palmer, and at the deposition— although it did not ask Palmer about the pinch point directly—it

asked Palmer whether he had "expressed all of the opinions today that [he expected] to express at trial," and he responded by stating that "[n]othing else comes to mind right now" and "obviously my report contains a lot of the information we've already discussed" but that he could not "think of anything that's in the report that we haven't already discussed." Fairly construed, Palmer's deposition testimony indicates that he was planning to stick to his opinion—clearly expressed in the preliminary report—that the Cable had been crushed near Point 1. And prior to trial, the Petersons never issued supplemental expert disclosures indicating that Palmer had changed his opinion on that issue.

¶48    It was not until the evening after the second day of trial (the night before Palmer's scheduled trial testimony), when the Petersons' counsel emailed a set of PowerPoint slides to Hyundai's counsel, that the Petersons disclosed that Palmer would be offering a different opinion as to the precise location of the pinch point. We agree with the trial court that the Petersons' obligation to supplement their expert disclosures regarding Palmer arose earlier than that; indeed, the Petersons acknowledge that they learned of Palmer's intent to change his opinion regarding the pinch point at least a week prior to trial. And there is no evidence in the record that Hyundai knew of that change at any point prior to receiving the PowerPoint slides.

¶49    Moreover, the difference in Palmer's opinion appears to be important. We acknowledge the Petersons' point that, at some level, the precise location of the pinch point does not matter to their theory of causation—according to the Petersons, Hyundai should be liable regardless of whether the Cable was pinched at Point 1, at Point 2, or someplace else. But the precise location of the pinch point mattered to the cohesiveness of Palmer's overall theory of how the fire started, and to his credibility; indeed, in rebutting Palmer's opinions, Hyundai (and Colwell) spent a lot of energy arguing that Palmer's theory was infirm given that

Point 1 was located too far from the routing of the Cable for it to have possibly been pinched there. Our rules require supplementation if the original disclosure is "incomplete or incorrect in some important way," *see* Utah R. Civ. P. 26(d)(5), and we have no trouble concluding that, in the ebb and flow of this particular case, Palmer's opinion about the precise location of the pinch point was important enough to trigger supplementation obligations.

¶50    With regard to Hodson, the analysis is slightly different, but we reach the same result. One difference between Hodson's situation and Palmer's is that Hodson, in his preliminary report, offered no opinion—via photographs or otherwise—regarding the precise location of the pinch point. After the Petersons disclosed Hodson as one of their retained experts, Hyundai opted to take Hodson's deposition, and a litigant who makes that election assumes the burden of "'ask[ing] the necessary questions to "lock in" the expert's testimony.'" *See Arreguin-Leon*, 2018 UT App 225, ¶ 24 (quoting Utah R. Civ. P. 26 advisory committee notes). At the deposition, Hyundai did not ask Hodson whether he had any opinion about the precise location of the pinch point. *See supra* note 1. But Hyundai did ask Hodson, at the end of his deposition, whether he had the chance to set forth "all of the opinions that [he] expect[ed] to testify to at trial," and Hodson answered in the affirmative, without indicating that he had an opinion regarding the precise location of the pinch point. In *Arreguin-Leon*, we concluded that such a question was sufficient to "lock in" an expert's testimony to only those opinions that had been offered at the deposition. *See id.* ¶ 25. Indeed, we held that an expert who attempted to offer an opinion not set forth either in the expert disclosure or at a deposition in which that "lock-in" question had been asked had "exceeded both the scope of the disclosure and scope of the deposition as 'locked in' by questioning." *Id.*

¶51 Unlike Palmer, Hodson in his trial testimony did not contradict any opinion he offered in his preliminary report or in his deposition. But he did offer a new opinion not set forth in either his preliminary report or his deposition, even after having been asked at his deposition if he had shared with Hyundai all the opinions he intended to share at trial. Our rules require supplementation when expert disclosures are "incomplete or incorrect in some important way." *See* Utah R. Civ. P. 26(d)(5). Palmer's disclosures (as the Petersons eventually conceded) were incorrect, and the supplementation obligation was triggered on that basis. Hodson's disclosures were not incorrect, but they were materially incomplete, an eventuality that also triggers supplementation obligations. And we have already explained, in our discussion of Palmer's opinions and disclosures, why these experts' opinions regarding the precise location of the pinch point were important in this case.

¶52 Accordingly, we agree with the trial court that the Petersons violated disclosure supplementation obligations with regard to both Palmer and Hodson, and that those experts' opinions, expressed at trial, that the Cable had been pinched near Point 2 constituted "'surprise' testimony" that, prior to trial, had "not been disclosed to, or evaluated by" Hyundai. *See Arreguin-Leon*, 2018 UT App 225, ¶ 24. And we discern no reason not to defer to the trial court's conclusion that, in this instance, the proper remedy for the disclosure violation should have been exclusion of the undisclosed opinions.[12]

---

12. The Petersons make no argument, in their briefing, that they had good cause for their failure to supplement, or that such failure was harmless. *See* Utah R. Civ. P. 26(d)(4).

2.      Jury Instructions

¶53   The second trial-related infirmity the trial court identified concerned potential errors in the jury instructions regarding products liability. This infirmity is an "error in law," *see* Utah R. Civ. P. 59(a)(7), and we review for correctness a trial court's determination regarding legal error, *see ASC Utah, Inc. v. Wolf Mountain Resorts, LC*, 2013 UT 24, ¶ 23, 309 P.3d 201.

¶54   As explained above, *see supra* ¶ 20, the jury instructions did not fully explain that the Petersons bore the burden of proof on their claims for negligence and strict liability in the products liability context. The introductory burden of proof instruction given in this case did not specify which party bore the burden of proof; that instruction stated simply that "the party" with the burden of proof "must persuade you, by the evidence, that the fact is more likely true than not true." One of the specific cause-of-action-level instructions—the one regarding the Petersons' claim for breach of warranty in the products liability context—did specify that the Petersons bore the burden of proof on that claim. But on the Petersons' other two claims—for negligence and strict liability in the products liability context—the instructions did not specify that the Petersons bore the burden of proof; instead, those instructions stated that the jury "must decide whether" the elements of the claim were met.

¶55   We acknowledge that these instructions were taken directly from MUJI. But our supreme court has noted that the model instructions are not always entirely correct. *See Jones v. Cyprus Plateau Mining Corp.*, 944 P.2d 357, 359 (Utah 1997) ("[T]he MUJI are merely advisory and do not necessarily represent correct statements of Utah law."). Trial judges, with some justification, often take refuge in the model instructions, as the trial court in this case initially did. But trial judges should do so warily, and should be open to the possibility—whether raised by counsel or discovered sua sponte—that the MUJI instructions

might need improvement. We commend the trial court, in this case, for being willing to take a second look at the instructions in connection with the post-trial motions.

¶56    We agree with the trial court's assessment that the jury instructions—even viewed as a whole and in conjunction with the verdict form, *see State v. Garcia*, 2001 UT App 19, ¶ 13, 18 P.3d 1123 ("Jury instructions must be evaluated as a whole to determine their adequacy.")—were infirm regarding the burden of proof. Although the instructions did inform the jury that the applicable burden of proof was "preponderance of the evidence," the instructions failed to inform the jury that the Petersons—and not Hyundai—bore that burden with regard to the Petersons' claims for negligence and strict liability. The two cause-of-action-level instructions on those counts did not so specify (even though the instruction regarding breach of warranty *did* so specify). And as the trial court eventually determined, the general introductory instruction didn't either, stating simply that "the party" bearing the burden "must persuade you." Moreover, the special verdict form likewise did not tell the jury that the Petersons bore the burden of proof on those two claims. All of this is problematic, because instructions must inform the jury which party bears the burden of proof on which claims and defenses. *See id.* ¶¶ 14, 16 (stating that "burden of proof instructions should be made plain to the jury," and are infirm if they do not "clearly communicate to the jury what the burden of proof is and who carries the burden" (quotation simplified)); *cf. State v. Ramos*, 2018 UT App 161, ¶ 19 n.8, 428 P.3d 334 ("Jury instructions should, at all times, clearly express that the State bears the burden of proof.").

¶57    Accordingly, the trial court correctly determined that the jury instructions were erroneous, because they did not inform

the jury that the Petersons bore the burden of proof on their claims for negligence and strict liability.[13]

B.     Prejudice

¶58    After determining that the trial court did not err in concluding that there were two trial improprieties, we now turn our attention to the second part of the inquiry: whether these improprieties were significant enough to warrant a retrial. The trial court determined that they were and, as noted, on this part of the inquiry we review the trial court's determination for abuse of discretion. *See State v. De La Rosa*, 2019 UT App 110, ¶¶ 5, 9, 445 P.3d 955. We discern no abuse of the trial court's discretion.

¶59    First, with regard to the expert disclosure issues, the trial court was clearly quite concerned, at one point jumping in sua sponte to express its view that it was "not really happy with the direction that this has taken," and later describing the Petersons' disclosure failures as "giv[ing] all the appearances of an ambush." In its written ruling, the court noted that it had allowed Palmer to offer his Point 2 opinion to the jury after taking at face value the Petersons' initial justification for the nondisclosure—that Colwell had personally witnessed the pinched Cable—and it expressed disappointment and frustration after it was determined, through Palmer's own testimony, that the facts underlying this justification were untrue. The court also noted that one of the primary contentions in Colwell's rebuttal to

---

13. We urge the Advisory Committee on Model Civil Jury Instructions to consider amending model instructions CV1002 and CV1016 to match model instruction CV1028. Such an amendment may include removing the "you must decide whether" language from model instructions CV1002 and CV1016, and replacing it with language indicating that "[name of plaintiff] must prove" the elements of the claim.

Palmer's opinions was that Point 1 was too far from the Cable for the Cable to have possibly been pinched there, and that Colwell had prepared his rebuttal report in reliance on Palmer's original Point 1 opinion. The court stated that it would not have allowed the Petersons' experts to offer their Point 2 opinions had the court been properly informed about Colwell's inability to have ever personally viewed the pinched Cable, commenting that the matter "ought to have resulted with exclusion of" the undisclosed testimony.

¶60    The court did give a curative instruction, after Palmer had testified, commanding the jury to "disregard" those parts of Palmer's testimony "regarding the routing of the [Cable] and the placement of the alleged fault point." But the court later determined that "the horse, as they say, had already left the barn," and was concerned that the jury had relied on Palmer's testimony notwithstanding its curative instruction, noting that "[i]t is difficult to know how effective a curative instruction under these circumstances can ever be." The effectiveness of curative instructions is a subject of some judicial and academic debate. *See, e.g.*, *Wilson v. IHC Hosps., Inc.*, 2012 UT 43, ¶ 56, 289 P.3d 369 (stating that, at least where "the potential prejudice is the result of a party's deliberate strategy, . . . any substantial doubt about the effectiveness of curative instructions should be resolved in favor of the disadvantaged party in order to protect the integrity of the judicial process"); *State v. Harmon*, 956 P.2d 262, 277–78 (Utah 1998) (Durham, J., concurring) (reviewing "some of the literature and empirical evidence" and arguing that judicial confidence in the efficacy of curative instructions is "unjustified"); *see also* David Alan Sklansky, *Evidentiary Instructions and the Jury as Other*, 65 Stan. L. Rev. 407, 429 (2013) (stating that "sometimes" curative instructions work, "sometimes they fail, and sometimes they backfire," and their effectiveness depends on a host of variables, including "the seriousness of the charge" and "the personality of the jurors"). We do not intend to wade into that debate here. Indeed, under

current Utah law, a court's use of a curative instruction can be a factor in determining that no prejudice resulted from jurors having heard something that they shouldn't have. *See, e.g.*, *State v. Almaguer*, 2020 UT App 117, ¶ 13, 472 P.3d 326 ("The trial court may determine that a curative instruction is sufficient to alleviate any prejudice . . . ."). But it strikes us that a trial judge is in a better position than we are to evaluate the efficacy of a curative instruction in the context of a trial that the judge just conducted, and that a trial judge's determination that a curative instruction is unlikely to have alleviated the prejudice is worthy of our deference. *See, e.g.*, *State v. Winter*, 477 A.2d 323, 327 (N.J. 1984) ("[W]hen weighing the effectiveness of curative instructions, a reviewing court should give equal deference to the determination of the trial court."); *see also Wilson*, 2012 UT 43, ¶ 56 (stating that "any substantial doubt about the effectiveness of curative instructions should be resolved in favor of the disadvantaged party").

¶61 Second, with regard to whether the errors contained in the jury instructions made a difference to the outcome of the trial, the trial court noted that the jury found in favor of the Petersons on the two causes of action for which they were not informed that the Petersons bore the burden of proof, and found in favor of Hyundai on the breach of warranty claim, for which they were instructed that the Petersons bore the burden of proof. Because of the split verdict, the trial court was left with "an unsettling concern" that the erroneous instructions had made a difference, especially given the court's perception that "the elements for [the breach of warranty claim] and the strict liability claim are essentially the same."

¶62 On the other side of the ledger, we acknowledge that Hyundai's counsel, during both opening statement and closing argument, specifically told the jury that the Petersons bore the burden of proof on all three of their causes of action. Where attorneys, during closing argument, fill a gap in the jury

instructions, the presence of that argument can be a factor in determining that no prejudice resulted from the erroneous instructions. *See, e.g.*, *Martinez v. Wells*, 2004 UT App 43, ¶ 26, 88 P.3d 343 (stating that the defendant argued to the jury a matter that the jury instructions erroneously omitted, and that the defendant in that instance "has not shown that failing to give the requested instructions prejudiced him").

¶63    When we examine both of these issues in combination, we discern no abuse of discretion in the trial court's determination that the improprieties were prejudicial enough to warrant a retrial. The second issue—the erroneous jury instructions—may not have been enough, on its own, to warrant retrial, especially given Hyundai's statements correcting that oversight during argument. But taken together, these issues could very well have made a difference to the outcome of the trial. We are especially concerned with the expert disclosure issue, and defer to the trial court's determinations that it would have excluded Palmer's testimony had it been properly informed during the argument that occurred on the morning of the trial's third day, and that the curative instruction was not necessarily effective. Had the jury not heard Hodson and Palmer testify that the Cable was pinched near Point 2, the outcome of the trial could well have been different.

CONCLUSION

¶64    We lack appellate jurisdiction to consider either the Petersons' direct appeal or Hyundai's direct cross-appeal, and therefore dismiss those appeals. Accordingly, we do not reach the parties' challenges to the trial court's rulings regarding prejudgment interest or judgment as a matter of law. We do, however, have jurisdiction to consider the Petersons' interlocutory appeal, and on that issue we affirm the trial court's order granting a new trial. The case is remanded for further proceedings consistent with this opinion.

_____