**2025 UT App 6**

## THE UTAH COURT OF APPEALS

AMERITECH COLLEGE HOLDINGS, LLC; AMERITECH COLLEGE
OPERATIONS, LLC; AND AMERITECH COLLEGE, LLC,
Appellants and Cross-appellees,
*v.*
JULIE AIKEN AND DELL LOY HANSEN,
Appellees and Cross-appellants.

Opinion
No. 20220595-CA
Filed January 16, 2025

Third District Court, Salt Lake Department
The Honorable Kent R. Holmberg
No. 180908670

Matthew L. Lalli, David G. Barker, Ben T. Welch,
Cameron J. Cutler, Mikayla A. Irvin, James E.
Magleby, and Jennifer Fraser Parrish, Attorneys for
Appellants and Cross-appellees

Troy L. Booher, Erin B. Hull, Beth E. Kennedy,
Steven C. Smith, Kipp S. Muir, Stephen C. Biggs,
Tyler M. Hawkins, and Caroline A. Olsen, Attorneys
for Appellees and Cross-appellants

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JOHN D. LUTHY concurred.

TENNEY, Judge:

¶1     Ameritech College, LLC (the College) and several related
entities (collectively, Ameritech)[1] sued Julie Aiken and Dell Loy

---

1. The corporate entities include Ameritech College, LLC;
Ameritech College Holdings, LLC; and Ameritech College
Operations, LLC. In the briefing, the parties typically referred to

(continued…)

Hansen for their roles in certain management decisions and financial transactions. At trial, a jury determined that Ameritech should prevail on various theories of liability, but it also found that Ameritech had not proven any damages. Ameritech filed post-trial motions—for a new trial and for sanctions—which were denied by the district court. On appeal, Ameritech asserts that the district court exceeded its discretion by denying its request for a new trial based on defense counsel's repeated violations of various orders restricting the use of certain evidence. In the alternative, Ameritech argues that the district court exceeded its discretion by not holding the defense in contempt for those same alleged violations, and Ameritech further argues that the court should have awarded Ameritech its full amount of requested damages as a sanction. For the reasons set forth below, we see no abuse of discretion on either front. We accordingly affirm.

## BACKGROUND

*Ameritech's Financial Woes*

¶2    Ameritech is a private college that offers degrees and training in nursing and other healthcare related fields. In 2006, William Jones acquired an ownership interest in Ameritech. A short time after acquiring that interest, Jones began acting as Ameritech's operating "manager." During the course of Jones's management, Ameritech issued debt to various lenders, including

---

these entities collectively as Ameritech, and we'll do the same unless individual identification is necessary. We also note that in 2022, Ameritech rebranded as Joyce University of Nursing and Health Sciences. *See Ameritech College Is Now Joyce University!*, Joyce Univ. of Nursing and Health Scis., https://www.joyce.edu/about/ameritech-is-now-joyce/ [https://perma.cc/5ED9-LQ3F]. Because the events at issue in this appeal occurred before the rebranding, we'll refer to it as Ameritech throughout this opinion.

both Main Street Capital Corporation (Main Street) and Wasatch Ameritech Holdings (Wasatch), an entity owned by Hansen.

¶3    In June 2014, Jones appointed Aiken as interim CEO of the College (she had previously been the Nursing Program Director). At the time, Ameritech was experiencing financial difficulties, and those difficulties were significant enough that the United States Department of Education sent Ameritech a "stop pay letter." In that letter, the Department of Education informed Ameritech that its students, 65% of whom relied on Title IV federal financial aid, would no longer be eligible to receive federal financial aid unless Ameritech posted a letter of credit for $5.7 million (the Letter of Credit) by December 17, 2015.[2]

¶4    In an effort to obtain enough funds to post the Letter of Credit, Jones began negotiating with Main Street, Wasatch, and a set of other investors (collectively, the Lending Group). By December 10, 2015, Ameritech and the Lending Group had agreed on the "big terms" of a deal, which included a large loan and capital infusion by the Lending Group in exchange for 66% ownership and 100% control of Ameritech. But Jones ultimately decided to not agree to this deal because, while the agreement would have included a buyback provision that would entitle Jones to repurchase his ownership and control positions in the future, Jones also wanted "consent rights," meaning the ability to prevent the Lending Group from using its control to later eliminate the buyback provision and effectively prevent him from regaining control of Ameritech.

¶5    With no deal reached and the deadline fast approaching for posting the Letter of Credit, Ameritech underwent a change in

---

2. There is some ambiguity in the record as to the exact date in December by which the Letter of Credit needed to be posted, but it is clear enough that many involved considered December 17 to be the operative deadline.

control, which Jones later described as a "corporate takeover" (the Takeover) and which he asserted was "orchestrated" by Aiken, Hansen, and the Lending Group. Without delving too deep into the particulars here, the Lending Group essentially purchased a controlling equity stake in Ameritech in exchange for $5.15 million (the Capital Contribution), which reduced Jones's controlling stake to a minority position, and the Lending Group also loaned Ameritech an additional $556,695 (the Loan). With the benefit of these additional funds, Ameritech was able to post the Letter of Credit and the College's students were able to continue receiving federal financial aid.

¶6      As part of the Takeover, a new operating agreement went into place, and it specifically detailed the terms whereby Ameritech could buy back the Lending Group's shares and allow Jones to regain control of Ameritech (the Redemption Rights). Those terms required Ameritech to exercise the Redemption Rights, if at all, on or before September 30, 2017, pay the Lending Group the original cost of the shares plus 18% interest, and pay off other outstanding debts in full. In September 2017, Ameritech exercised the Redemption Rights, paying more than $16 million in redemption and transaction costs.

*Lawsuit and Trial*

¶7      In 2018, with Jones again in control, Ameritech initiated the current lawsuit against Aiken, and Hansen was later added as a defendant in an amended complaint. The amended complaint alleged that while helping to orchestrate the Takeover, Aiken had improperly shared Ameritech's confidential information with Hansen and others involved in the Lending Group while she was Ameritech's Interim CEO and while the Lending Group was negotiating to give money to Ameritech (and thereby acquire a controlling interest in it). Based on these allegations, Ameritech pleaded several causes of action against Aiken, mostly stemming from her alleged violations of her fiduciary duties to Ameritech,

and Ameritech also sued Hansen for his alleged role in these same events. As damages, Ameritech sought over $10 million, mostly made up of the interest associated with repurchasing the Lending Group's equity stake and paying off the Loan and "costs associated with legal and other professional assistance for the [r]edemption."

¶8    Just before trial, Ameritech filed a motion in limine—commonly referred to by the parties throughout the ensuing litigation and on appeal as Motion in Limine 7—in which it asked the district court to limit the use of certain information at trial about the money advanced to Ameritech by the Lending Group. In this motion, Ameritech acknowledged that the Capital Contribution and the Loan were "part of the factual background to the issues in dispute," and Ameritech did not dispute that evidence of these amounts could be presented to the jury as "background information." But Ameritech nevertheless argued that evidence that these amounts equaled the amount of the Letter of Credit or that the Department of Education had subsequently released the Letter of Credit funds to Ameritech would be irrelevant or unduly prejudicial.

¶9    Aiken and Hansen opposed Motion in Limine 7, arguing that "[e]vidence of how the funds were used is relevant to several issues, including whether or not [Ameritech] suffered any injury, the amount of any damages [Ameritech] may recover, and the issue of punitive damages." Aiken and Hansen also argued that, in order to fully understand the dealings between the parties, the jury needed to hear as background that the $5.7 million advanced by the Lending Group (i.e., $5.15 million for the Capital Contribution plus $556,695 for the Loan) was used to fund the Letter of Credit and that the Department of Education had released that money back to Ameritech.

¶10    Because the district court was still awaiting Ameritech's reply memorandum on this issue, the court did not definitively

rule on Motion in Limine 7 before trial. Instead, in a memorandum decision disposing of several pre-trial motions, the court indicated that it was "inclined" to limit the evidence regarding the $5.7 million to "factual background evidence."

¶11 On October 6, 2021—the first day of what proved to be a 15-day trial—the district court discussed Motion in Limine 7 with the parties to ensure that it understood the positions of both sides. After hearing additional arguments, the court indicated that it would again defer ruling on it. But when Aiken and Hansen's attorney (Defense Counsel)[3] indicated that he intended to discuss matters implicated by Motion in Limine 7 in his opening statement later that day, the district court agreed to give the parties additional guidance. Specifically, Defense Counsel informed the court that he wanted to "tell the jury" that when Aiken agreed to allow the Capital Contribution and the Loan to be advanced to Ameritech, "it was intended to post the letter of credit to keep the college open"—that this was Aiken's "state of mind." Defense Counsel also said that he wanted to discuss the Redemption Rights and how the terms of that transaction tied back to the amount of the original Capital Contribution.

¶12 In response, the court outlined what it considered to be admissible background facts: namely, that the Capital Contribution was made by the Lending Group, that "the college was in crisis and needed the letter of credit," and evidence about Aiken's "intention in playing a part in that." Turning to the Redemption Rights, the parties then had a long discussion with

---

3. Aiken and Hansen mounted a joint defense. And while they were represented by four attorneys, most of the in-court appearances were handled by a single attorney. As will be discussed at length below, the issues raised on appeal are centered in large part on the conduct of this attorney. For narrative clarity, we'll refer to this attorney with the singular Defense Counsel moving forward.

the court about whether the defense could connect the cost of exercising the Redemption Rights to the Capital Contribution. After initially agreeing that it would be proper to mention that the amount needed to exercise the Redemption Rights was tied to the Capital Contribution, the court changed its mind, stating that it would allow discussion of how the Redemption Rights were "computed" (which was the original cost of the shares plus 18% interest) but that it would not permit the defense to "tether" the Redemption Rights to "when those contributions were made or how they were made."

¶13　During Defense Counsel's opening statement, he made several references to the fact that the College was in "serious trouble," making an analogy to a "sinking ship." Twice, Defense Counsel explicitly tied the infusion of $5.7 million to Ameritech (under Aiken's leadership at the time) posting the Letter of Credit. In discussing the Redemption Rights, Defense Counsel told jurors that "there was a formula in the Operating Agreement that said to get out, all you have to pay is the amount of the outstanding loan and that capital account with an internal rate of return." He also said at one point that "the amount paid was the amount that was owed."

¶14　Ameritech's counsel made several objections during Defense Counsel's opening statement, but none of them related to the court's preliminary guidance on Motion in Limine 7 (which, again, was not yet definitively decided).

¶15　On October 11, a day when trial was not held, the court issued a written ruling granting Motion in Limine 7. In this ruling, the court "confirm[ed] its initial inclination to limit the evidence" regarding the Capital Contribution and Loan "to factual background evidence." It then explained:

> The Court rejects [Aiken and Hansen's] argument that they should not be precluded from offering evidence that these funds were used to post the

[Letter of Credit] or that [Ameritech] ultimately retained the funds. The Court carefully considered but was unpersuaded by [Aiken and Hansen's] argument that such evidence goes to whether [Ameritech] suffered any injury, the amount of their recoverable damages and the issue of punitive damages. Instead, the Court agrees with [Ameritech] that beyond mere background information, further evidence or argument regarding the use of the funds does not bear on [Ameritech's] causes of action or claims for damages.

This was the full extent of the court's instructions. Of some note, the court did not explicitly mention the Redemption Rights in this ruling, nor did it explain with any specificity the parameters of what it considered to be permissible "factual background evidence."

¶16    On October 14, the sixth day of trial, Aiken and Hansen filed a motion asking the court to reconsider its ruling on Motion in Limine 7. Aiken and Hansen argued that evidence about how the Letter of Credit was funded, how the Capital Contribution benefited Ameritech, and how the exercise of the Redemption Rights related to the Capital Contribution was "some of the most relevant evidence in this case on the fact and amount of damages." The district court did not immediately rule on this motion, and the trial moved forward.

¶17    During trial, both sides presented extensive documentary evidence and witness testimony. This included testimony from Jones, who began testifying before the motion to reconsider was filed, continued testifying after it had been filed, and finished testifying before it was ruled on. Defense Counsel's cross-examination of Jones frequently discussed matters relevant to the

various issues implicated by Motion in Limine 7. The following examples are emblematic of how those exchanges proceeded.

- Defense Counsel asked Jones if the Loan related to "the amount that was advanced by the lender to post the letter of credit," which led to an objection from Ameritech's counsel and a sidebar. After returning from the sidebar, Defense Counsel asked Jones, "[T]hat amount, $556,695, which came in as a loan, and $5,150,000, which came in as a Class B capital contribution, totaled the amount of the letter of credit, correct?" When Ameritech's counsel again objected, the district court overruled the objection.

- Defense Counsel referred to an exhibit that showed the Redemption Rights "payoff schedule," after which he asked Jones if one of the figures referred to "the equity which had been advanced by the lending group." Ameritech's counsel objected based on Motion in Limine 7, which was sustained. Defense Counsel then rephrased his question, asking, "The bottom part [of the payoff schedule] is the equity—identified as equity that had been advanced in the amount of $5,150,000; correct?" Ameritech's counsel again objected, which led to a sidebar. Following the sidebar, Defense Counsel asked Jones, "This is—the $5,150,000 was the amount contributed by the lending group on or about December 17, 2015, to the best of your knowledge?" Ameritech's counsel again objected based on Motion in Limine 7, but the objection was overruled.

- Defense Counsel started to ask Jones, "And in this redemption notice, you indicated that you were going to pay back the $5,150,000—." Ameritech's counsel objected mid-question, and the objection was sustained. Defense Counsel then asked, "So you gave

notice that you were exercising your redemption rights to purchase the Class B participating shares or membership units held by the lender group; correct?" Ameritech's counsel again objected, but this objection was overruled.

¶18 As this questioning of Jones continued, Defense Counsel asked Jones, "You don't deny that the money was contributed by the lenders in that amount on or about December 17, 2015; correct?" Ameritech's counsel objected and the district court sustained the objection and struck the question. Defense Counsel then asked Jones, "You admit, do you not, that the lenders made a capital contribution of that amount on or about December 17, 2015?" Ameritech's counsel again objected, and the district court sustained that objection and struck the question. Defense Counsel's next question was a reworded version of the prior two. The court sustained an objection to this question, after which it called a recess. During that recess, the district court observed that, in its view, Defense Counsel had been "tethering" the amounts of the Capital Contribution to the amount required for redemption since the beginning of trial. The court further observed, "And it has been relatively consistent. And I understand you feel passionate about it and that you feel that the Court's rulings are wrong . . . . But during the legal portion of this case in front of the jury, they're not to be tethered." Defense Counsel responded that he had "tried to be true to the written ruling" on Motion in Limine 7, but he then said he thought that ruling needed further "clarification." Defense Counsel explained that, in his view, the October 11 ruling on Motion in Limine 7 did not say anything about evidence related to the Redemption Rights, which is what several of the sustained objections had been about. The court stated that it intended the October 11 ruling to apply more broadly to include any tethering of the Capital Contribution to the Redemption Rights. The court then vetted Defense Counsel's remaining questions for Jones before the trial proceeded that day,

and there were no further objections based on Motion in Limine 7 during the remainder of the questioning of Jones.

¶19 On October 20, which was the tenth day of trial, the district court issued a decision (the October 20 Decision) denying Aiken and Hansen's motion to reconsider the October 11 ruling on Motion in Limine 7. In the October 20 Decision, the court went to much greater lengths than it previously had in explaining what was and was not admissible. First, the court addressed tethering between the Capital Contribution and the Redemption Rights, a subject that had been discussed in the tentative ruling issued on October 6 but had been unaddressed in its October 11 written ruling. It explained that Defense Counsel was mistakenly "cast[ing] the Capital Contribution and the subsequent exercise of the Redemption Right[s] as something akin to the repayment of principal under a loan, where the result is a net zero economic loss." In the court's view, "the true nature of the Capital Contribution" was as an investment that "became the property of the College and lost its character" as resources belonging to the Lending Group once transferred. The court accordingly stated that it saw "no basis for [Defense Counsel] to tether the Capital Contribution . . . to the amount paid in connection with" exercise of the Redemption Rights. The court then discussed the use of evidence about any relationship between the Capital Contribution and the Letter of Credit. It commented that "the evidence related to the Capital Contribution and the use of these funds for the purposes of posting the Letter of Credit has been limited as required by the Court's previous rulings on this point." And while acknowledging that Defense Counsel had made "multiple attempts to expand the use of this evidence," the court noted that it had sustained many objections and would also issue a limiting instruction to the jury to mitigate any improprieties that had already occurred.

¶20 After the court issued this decision, Defense Counsel asked only one more question for which the district court sustained an

objection based on Motion in Limine 7. The question was directed at Hansen, with Defense Counsel asking him to report whether the $5.7 million had been "paid back at some point." The district court sustained Ameritech's counsel's objection, Defense Counsel withdrew his question, and the answer Hansen had already given was stricken.

¶21     At the close of trial, the jury was given instructions, one of which was the limiting instruction that the district court alluded to in the October 20 Decision. That instruction stated: "During this case you may have heard reference to [the Capital Contribution] as well as [the Loan], totaling approximately $5.7M. This information is for factual background only. You may not consider this information for purposes of assessing liability, legal defenses, or in calculating any damages award." During closing arguments, Defense Counsel discussed the Loan, the Capital Contribution, the Letter of Credit, and the Redemption Rights in various ways. As will be discussed in more detail in our Analysis below, Ameritech's counsel did not object to any of those references.

¶22     After deliberating, the jury issued its verdict. Through a special verdict form, the jury found that Aiken had breached her fiduciary duties and engaged in fraudulent non-disclosure, negligent misrepresentation, and tortious interference, and that Aiken and Hansen had engaged in a civil conspiracy. But for each cause of action, the jury also found that Ameritech had not established causation between Aiken's and Hansen's conduct and the alleged damages.

*Post-Trial Motions*

¶23     After the verdict, Ameritech filed a motion requesting either (1) a new trial on damages pursuant to rule 59(a)(1) or (2) a ruling holding Aiken and Hansen in contempt for Defense Counsel's conduct and awarding sanctions of more than $10 million. As foundation for both requests, Ameritech claimed that

Defense Counsel had committed "repeated" and "deliberate" violations of the court's rulings on Motion in Limine 7.

¶24   After receiving written opposition from Aiken and Hansen and holding argument on the motion, the district court denied both requests.

¶25   Commenting on the issues that were at the heart of both requests—i.e., Defense Counsel's alleged violations of the rulings relating to Motion in Limine 7—the court observed that there had been "an evolution and expansion" in its own rulings. The court further observed that "it may initially have been difficult to draw the line between permissible 'factual background evidence' . . . and impermissible tethering." The court then expressed its view that it was the October 20 Decision, "together with verbal directives, sustained objections and sidebar conferences," that ultimately "delineated the boundaries regarding the $5.7 million contribution" and "provided clear notice to counsel of what constituted a violation going forward." Given what it saw as its own lack of clarity before October 20, the court ruled that "no violation of the in limine rulings had occurred" prior to October 20, and it then observed that "nearly two-thirds" of the trial had already been completed as of that point.

¶26   Turning to the motion for a new trial, the court said that, "[h]aving presided over the trial, and upon careful review of the record," it thought "the isolated instances of violations of its in limine order after October 20 did not prejudice [Ameritech] or come close to depriving [it] of a fair trial." In the court's view, the violations "viewed in the context of the entire trial record . . . were harmless." Explaining this conclusion, the court opined that "there was nothing inherently prejudicial about the evidence of the $5.7 million contribution or its tethering" to the Letter of Credit or the Redemption Rights "such that prejudice can be presumed," because "the fact of the $5.7 million contribution was permissible background information necessary for the jury to

understand the case." The court expressed its view that Ameritech had "exaggerated the relative importance and magnitude of [D]efense [C]ounsel's conduct as it related to references to the prohibited 'tethering' of the $5.7 million contribution." And in the court's opinion, any prejudice that did result was mitigated because the court had taken "swift action to address potential issues by ruling on objections throughout trial, and ultimately, by giving the limiting instruction requested by" Ameritech.

¶27 The court specifically rejected Ameritech's contention that "the only reasonable explanation for the jury finding multiple breaches, but no damages, [was] [D]efense [C]ounsel's misconduct." Instead, the court pointed out that "the jury repeatedly answered in the negative when asked about causation," and the court said that it was persuaded that "the jury simply rejected [Ameritech's] theory and it had nothing to do with tethering or any misconduct." Taking all of this together, the court concluded that Ameritech had not established that it "did not receive a fair trial" and that Ameritech had not convinced the court that "the jury would have reached a different verdict absent the few improper references concerning the $5.7 million contribution."

¶28 In denying the request for contempt and sanctions, the court recognized that there were some "problematic exchanges" that occurred "after" the October 20 Decision. But the court said that, "having carefully reviewed the record," and in light of "the broader context," it was convinced that these were "isolated incidents that did not constitute the type of violation to support a finding of contempt."

## ISSUES AND STANDARD OF REVIEW

¶29 Ameritech appeals the district court's denial of its motion for either a new trial on damages or instead a contempt ruling and sanctions. As further explained below, we review both issues for

an abuse of discretion. *See Smith v. Volkswagen SouthTowne, Inc.*, 2022 UT 29, ¶ 40, 513 P.3d 729 (stating that we generally "apply an abuse of discretion standard in reviewing a district court's decision to grant or deny a new trial" (quotation simplified)); *LD III LLC v. Davis*, 2016 UT App 206, ¶ 12, 385 P.3d 689 ("An order relating to contempt of court is a matter that rests within the sound discretion of the district court. We accordingly review the sanctions imposed by the district court for an abuse of that discretion." (quotation simplified)).

## ANALYSIS

### I. Motion for a New Trial

¶30 Ameritech first argues that the district court abused its discretion by denying Ameritech's motion for a new trial on damages. We disagree.

¶31 Ameritech's new trial motion was filed pursuant to rule 59(a)(1) of the Utah Rules of Civil Procedure. We've previously held that "there are two aspects to a court's decision-making process in ruling on a motion for new trial, and there are differences in the manner in which we review each aspect." *Clarke v. Clarke*, 2023 UT App 160, ¶ 22, 542 P.3d 935 (quotation simplified). "First, a trial court must determine that there exists a problem that may require a retrial." *Id.* (quotation simplified); *see also Peterson v. Hyundai Motor Co.*, 2021 UT App 128, ¶ 31, 502 P.3d 320 (recognizing that a court must first determine whether there exists "an error of law, say, or a trial impropriety" that satisfies one of the grounds set forth in rule 59). Our review of a trial court's ruling on this first step changes somewhat depending on the nature of the ruling—if the ruling rested on a "factual determination," it is reviewed for an abuse of discretion, but if it was based on a "legal error[]," the ruling is reviewed for correctness. *Clarke*, 2023 UT App 160, ¶ 22 (quotation simplified).

¶32 "Second, after determining that an error or impropriety of some kind exists, a trial court must determine whether the identified errors or improprieties are significant enough to warrant a retrial." *Id.* (quotation simplified). This determination is limited in some measure by rule 61 of the Utah Rules of Civil Procedure and the question of whether the error at issue was prejudicial. *See Peterson*, 2021 UT App 128, ¶ 32; *see also Ivie v. Richardson*, 336 P.2d 781, 787 (Utah 1959) ("The errors must be real and substantial and such as may reasonably be supposed would affect the result."). And in the case of an impropriety covered by rule 59(a)(1), the prejudice component is explicit and independent from any limit in rule 61 because rule 59(a)(1) allows for a new trial only when an identified "irregularity" "prevented [a party] from having a fair trial." Utah R. Civ. P. 59(a)(1); *see also Child v. Gonda*, 972 P.2d 425, 430 (Utah 1998) (suggesting that the "fair trial" component of rule 59(a)(1) is linked to the question of whether the party was prejudiced by the error that justifies relief under rule 59 generally); *Schmidt v. Intermountain Health Care, Inc.*, 635 P.2d 99, 101–02 (Utah 1981) (same). A district court's assessment of whether an error was "significant enough" or prejudicial enough to warrant a new trial is "reviewed for abuse of discretion." *Clarke*, 2023 UT App 160, ¶ 22 (quotation simplified); *see also Peterson*, 2021 UT App 128, ¶ 32 (holding that, for purposes of the second step, "we afford deference to a trial court's determination, reviewing only for an abuse of discretion"); *State v. De La Rosa*, 2019 UT App 110, ¶¶ 5, 9, 445 P.3d 955 (recognizing that the assessment of whether an error "merited a new trial" is "inherently difficult for appellate courts to second guess" and further recognizing that such questions are "entirely within the discretion of the trial court due to its advantaged position to judge the impact of legal errors on the total proceedings" (quotation simplified)); *Hartvigsen v. Hartvigsen*, 2018 UT App 238, ¶ 5, 437 P.3d 1257 (recognizing that a district court is given "wide latitude" in making this decision (quotation simplified)).

¶33 As explained below, (A) we see no abuse of discretion in the district court's determination that, under the circumstances of this case, the only "irregularities" that could justify relief under rule 59(a)(1) were violations of the court's ruling on Motion in Limine 7 that occurred after October 20, and (B) we then see no abuse of discretion in the court's conclusion that Ameritech was not prejudiced by any such violations.

A.       Ground for Relief Under Rule 59

¶34 The first question is whether there was a ground for relief under rule 59. Ameritech's motion was predicated on rule 59(a)(1), which states that a new trial may be granted based on an "irregularity in the proceedings of the court, jury or opposing party . . . by which a party was prevented from having a fair trial." Utah R. Civ. P. 59(a)(1). In Ameritech's view, the "irregularity" that justified relief here was Defense Counsel's pattern of violating the district court's rulings relating to Motion in Limine 7.

¶35 As indicated, for purposes of this first step of the rule 59 analysis, we've differentiated between rulings that rest on a "factual determination" (which are reviewed for an abuse of discretion) and rulings that are based on "legal errors" (which are reviewed for correctness). *Clarke*, 2023 UT App 160, ¶ 22 (quotation simplified). But the error in question here doesn't fit comfortably in either category. Ameritech's challenge isn't directed at any particular factual determination, nor is it directed at any particular ruling of the court. Rather, Ameritech's argument is that when Defense Counsel repeatedly flouted the court's rulings, that pattern (and the resulting evidence that the jury heard), in the aggregate, created an irregularity.

¶36 In our view, a district court's ruling on this kind of claim is naturally reviewed for an abuse of discretion. After all, in terms of institutional competencies, a district court is in a better position than we are to determine how egregious the violations of its own

rulings were. And as indicated, when we review a rule 59 determination, a prejudice determination is reviewed for an abuse of discretion. *See id.; see also Peterson*, 2021 UT App 128, ¶ 32. As a result, we conclude that when a party requests a new trial under rule 59(a)(1) based on an irregularity that allegedly deprived it of a fair trial, a district court's ruling on the first step is reviewed for an abuse of discretion.

¶37 The district court concluded that, for purposes of the "irregularity" analysis under rule 59(a)(1), it would limit its analysis to violations that occurred after the October 20 Decision. Under the unique circumstances of this case, and in light of the deference that is afforded to the district court, we see no basis for overturning that decision. This is so for two interrelated reasons.

1. Lack of Clarity Before October 20

¶38 The parties have spent much energy on appeal disputing the number of times Defense Counsel violated the court's rulings related to Motion in Limine 7. In its brief, Ameritech claims that there were "at least 38" violations, and it suggests that the number may actually be higher. In Ameritech's view, it's this large number of violations that constitutes the irregularity that deprived it of a fair trial. While not necessarily conceding that there were any violations, Aiken and Hansen contend that, even if there were some violations, the number was much lower than Ameritech contends.

¶39 The district court was confronted with this exact question in Ameritech's rule 59 motion. And from the vantage point of being the very court that had issued the rulings in question, the district court concluded that it would be unfair to consider, as part of the rule 59 analysis, any violations that had occurred before the October 20 Decision. As noted, the court observed that before October 20, there had been "an evolution and expansion" in its own rulings on the related issues; that "it may initially have been difficult to draw the line between permissible 'factual background

evidence'" and "impermissible tethering"; and that, up until October 20, there had been a real-time process of "sustained objections and sidebar conferences" that had given the parties guidance on what was and was not permissible.

¶40 We recounted the court's various rulings on these issues in the Background. We note here the following:

- Before trial, the court deferred decision on Motion in Limine 7 but said that it was "inclined" to limit the evidence regarding the Capital Contribution and the Loan to "factual background evidence" without describing what it believed such background evidence entailed.

- After hearing further arguments on these issues on October 6 (which was the first day of trial), the court again said that it would allow, as "background facts," evidence that a Capital Contribution was made, "that the college was in crisis and needed the letter of credit," and "whatever you think the evidence will prove as far as [Aiken's] intention in playing a part in that." But the court then said that it would prohibit any evidence or arguments that "tether[ed]" the Capital Contribution to the Redemption Rights.

- On October 11, the court issued its ruling granting Motion in Limine 7. In that ruling, the court again said that Defense Counsel could present evidence about the Capital Contribution and Loan as "factual background evidence." But it now said that it would prohibit evidence that the Capital Contribution and Loan "were used to post" the Letter of Credit or that Ameritech "ultimately retained the funds," and it further "agree[d]" with Ameritech that "beyond mere background information, further evidence or argument regarding the use of the funds does not bear on

[Ameritech's] causes of action or claims for damages." But the court did not reference how it thought the tethering of the Capital Contribution to the Redemption Rights should be handled.

- Then, on October 20, the court issued a ruling on the motion to reconsider that definitively held that Defense Counsel could not tether the Capital Contribution and Loan to the Redemption Rights, and it also held "the evidence related to the Capital Contribution and the use of these funds for the purpose of posting the Letter of Credit has been limited as required by the Court's previous rulings on this point."

¶41 Two things in particular stand out from this. The first is that at all times in this trial—both before and after the October 20 Decision—the court expressly said that Aiken and Hansen could present evidence to the jury of Ameritech's financial difficulties, the Letter of Credit obligation, the Capital Contribution, the Loan, and the Redemption Rights. The court's prohibitions along the way were not about admission of or reference to this evidence *per se*; rather, the prohibitions were more narrow, focusing on certain kinds of evidence and argument involving "tethering." Second, as the court itself later acknowledged, its rulings about what would or would not constitute "impermissible tethering" evolved up until October 20. On October 6, the court seemed to indicate that Aiken and Hansen could not tether the Capital Contribution to the Redemption Rights. But when Motion in Limine 7 was granted on October 11, the court didn't mention this particular link, instead indicating that Aiken and Hansen could not tether the Capital Contribution or the Loan to the Letter of Credit. It wasn't until October 20 that the court specifically discussed both types of tethering at one time.

¶42 At several points during the trial, Defense Counsel expressed his resultant confusion—both about (1) where the line

was between permissible "background facts" and impermissible "tethering," as well as (2) the nature of the impermissible "tethering" itself. Before Defense Counsel's opening statement, for example, Defense Counsel told the court, "I don't know how to tether this line that the Court's trying to fix for me." And during a sidebar that occurred before October 20, Defense Counsel said, "I'm not trying to be facetious. I'm genuinely trying to understand the Court's ruling."

¶43 The district court also acknowledged its lack of clarity in real time. At one point during the trial, for example, the court acknowledged that the "language" of its prior rulings had been "imprecise." And again, in its post-trial ruling, the court acknowledged that there had been "an evolution and expansion" in its rulings on these issues, and it further stated that "it may initially have been difficult to draw the line between permissible 'factual background evidence' of describing the dots and impermissible tethering or connecting the dots."

¶44 Ameritech nevertheless insists on appeal that the district court's rulings were clear enough all along. But the district court itself acknowledged during trial that the line between what was permissible and impermissible was not particularly clear, Defense Counsel repeatedly said during trial that he thought the line was not particularly clear, and, with the benefit of retrospection, the district court again said after trial that it thought the line it had drawn was not particularly clear until October 20. Given all this, it would be an odd thing for us as an appellate court to now say that, in *our* view, the line was actually clear enough that we think the asserted pre-October 20 violations constituted an irregularity under rule 59(a)(1).

2.     The Timing of, and Rulings on, Ameritech's Objections

¶45 This conclusion is further supported by the nature of the objections that were and were not lodged, as well as by the court's rulings on the objections that were made.

¶46 As noted, Ameritech claims that there were "at least 38" violations. But for a large number of these, Ameritech did not object. In its brief, for example, Ameritech points to 11 instances from Defense Counsel's opening statement, as well as 10 more alleged violations from Defense Counsel's closing argument. But Ameritech never objected to any of these statements on the basis of Motion in Limine 7. Ameritech also claims that there were 17 violations during witness questioning at trial, but, in the end, only a handful of these instances were both objected to on Motion in Limine 7 grounds and sustained by the court.

¶47 For purposes of the particular issue before us on appeal, we find it problematic that Ameritech has relied on several instances in which Ameritech objected below based on Motion in Limine 7, but the district court then overruled the objection. For example, the district court overruled Ameritech's objection when Defense Counsel asked Jones whether the "amount, $556,695, which came in as a loan, and $5,150,000, which came in as a Class B capital contribution, totaled the amount of the letter of credit." And as another example, the court permitted this question from Defense Counsel to Jones over Ameritech's objection: "So you gave notice that you were exercising your redemption rights to purchase the Class B participating shares or membership units held by the lender group; correct?"

¶48 It's true that, on occasion, Utah appellate courts have allowed a rule 59 new trial motion to be based on an error for which there was no objection. *See, e.g.*, *Smith v. Volkswagen SouthTowne, Inc.*, 2022 UT 29, ¶ 113, 513 P.3d 729 (allowing a party's motion for a new trial to survive a challenge of preservation even though the party had not objected or even raised the issue in its own motion where the court had sua sponte raised the concern as permitted by rule 59(d) of the Utah Rules of Civil Procedure); *Clayton v. Ford Motor Co.*, 2009 UT App 154, ¶ 19, 214 P.3d 865 (allowing appeal of a motion for a new trial on an issue that was raised for the first time in that motion). But in those

instances, the courts thought it was clear enough that the conduct in question was legally impermissible. In *Smith*, for example, the district court's sua sponte decision to order a new trial was based on its realization that it had allowed expert testimony that was critical to a party's claims and which should have been excluded under rules 703 and 702 of the Utah Rules of Evidence. 2022 UT 29, ¶¶ 97, 104–05. And in *Clayton*, the moving party became aware of potential tampering with evidence during trial. 2009 UT App 154, ¶ 18.

¶49    For purposes of this appeal, we have no need to definitively weigh in on the interplay between the preservation rule and rule 59. Rather, under the circumstances of this case, what matters about the objections—including the ones that were made, the ones that weren't, and the court's rulings on the actual objections—is how they relate to the lack of clarity with respect to what was and was not permissible. Again, at all times, Aiken and Hansen were allowed to present evidence about some of these underlying issues as "background"; and while the court prohibited certain kinds of "tethering," there was (in its own words) an "evolution" in its rulings about what this meant. Given the very subtle distinctions at issue as well as the apparent confusion at trial about where the line really was, it was incumbent on Ameritech to object if and when it thought Defense Counsel had crossed the line. Indeed, as the court later explained in its ruling on the rule 59 motion, before October 20, much of the line-drawing had been done by "verbal directives, sustained objections and sidebar conferences." But because the district court, in many instances, *overruled* the objections that Ameritech did make (including many instances that Ameritech now claims were impermissible and thus supported its request for a new trial), those overruled objections would have communicated to Defense Counsel in real time that his conduct fell on the permissible side of the line. To the extent that there was some persistent confusion about what was and was not permissible, these rulings may have added to it; at minimum, the rulings

undermine any suggestion that these particular instances constituted an irregularity that later justified the request for a new trial.

¶50 In short, Ameritech claims that the irregularity that justified its request for a new trial was an aggregated pattern of violations of the court's rulings on Motion in Limine 7. But the rulings in question drew very fine lines and evolved in nature; Ameritech didn't always object; and when it did, the court overruled many of the objections. In these circumstances, we see no basis for concluding that the district court abused its discretion in declining to consider, for rule 59 purposes, any violations that occurred before October 20 when making its determination as to whether an irregularity occurred.

B. Prejudice

¶51 Under the second step of the rule 59 analysis, "a trial court must determine whether the identified errors or improprieties are significant enough to warrant a retrial." *Clarke*, 2023 UT App 160, ¶ 22 (quotation simplified). As noted, a district court's ruling on this question is reviewed for an abuse of discretion. *See id.*; *Peterson*, 2021 UT App 128, ¶ 32. This is so because the district court "is in a much better position than this court to evaluate the parties' conduct, the context in which the claimed irregularity occurred, and the fact-finder's reaction." *In re Estate of Wright*, 2024 UT App 146, ¶ 17, 559 P.3d 966 (quotation simplified).

¶52 Here, the district court determined that, "[h]aving presided over the trial, and upon careful review of the record, . . . the isolated instances of violations of its in limine order after October 20 did not prejudice [Ameritech] or come close to depriving [Ameritech] of a fair trial." Even if we assume that the violations that occurred after the October 20 Decision could constitute an irregularity, thereby satisfying the first step of the rule 59 analysis, we see no basis for overturning the district court's

conclusion that Ameritech was not prejudiced by those particular violations. This is so for several reasons.

¶53    First, by the time of the October 20 Decision, "nearly two-thirds" of the trial had already been completed. And as noted by the district court, there were only a few "isolated instances" in which Defense Counsel violated the ruling after that point.

¶54    Second, like the district court, we think it's significant that, under all of the district court's rulings on these issues, the jury was permitted to hear "background" evidence that overlapped in no small measure with the evidence at issue in Motion in Limine 7 (and, by extension, the rule 59 motion). Again, the jury was permitted to hear evidence of Ameritech's financial difficulties, the Letter of Credit obligation, the Capital Contribution, the Loan, and the Redemption Rights. Of some note, Ameritech has never challenged that allowance.

¶55    The evidence that was deemed impermissible was evidence suggesting that the Capital Contribution and the Loan had been "tethered" to the Letter of Credit or the Redemption Rights. Ameritech argues that it was prejudiced when Defense Counsel presented evidence about that tethering, and in doing so, Ameritech relies heavily on *Wilson v. IHC Hospitals, Inc.*, 2012 UT 43, 289 P.3d 369. But when Ameritech made that same argument to the district court, the district court thought that *Wilson* was distinguishable because of the kind of evidence at issue, and we agree.

¶56    *Wilson* involved a medical malpractice action in which a hospital's alleged negligence had resulted in brain damage to a newborn baby. *See id.* ¶ 1. Before trial, the district court had ordered the parties not to present evidence to the jury of health insurance benefits that the family had already received. *See id.* ¶ 28. The court ruled that such evidence would violate the "collateral source rule," under which "a wrongdoer is not entitled to have damages, for which he is liable, reduced by proof that the

plaintiff has received or will receive compensation or indemnity for the loss from an independent collateral source." *Id.* ¶ 31 (quotation simplified). Despite this ruling, the hospital made "persistent and deliberate references" during trial to such evidence. *Id.* ¶ 27. On appeal, our supreme court concluded these violations prejudiced the family, opining that "it has long been recognized that evidence of collateral source benefits involves a substantial likelihood of prejudicial impact," and it ordered a new trial as a result. *Id.* ¶¶ 46–47, 78 (quotation simplified).

¶57 Unlike collateral source evidence, the evidence in question here was not expressly prohibited by rule, nor is it the kind of evidence for which courts have recognized any sort of categorical rule of prejudice. Instead, as the district court pointed out, "there was nothing inherently prejudicial" about the jury hearing evidence of "the $5.7 million contribution or its tethering" to the Letter of Credit or even the Redemption Rights, "such that prejudice can be presumed, as was the case in *Wilson*." Indeed, Ameritech itself recognized below that information about the Capital Contribution and the Loan was "part of the factual background to the issues in dispute." And in denying the rule 59 motion, the district court likewise said that there was "no question that the fact of the $5.7 million contribution was permissible background information necessary for the jury to understand the case: the contribution was part and parcel of the takeover that is the basis of [Ameritech's] claims, and the amounts were openly and repeatedly documented in numerous trial exhibits and other evidence introduced by both parties at trial."

¶58 Third, before deliberations, the district court instructed the jury that it could not "consider" information about the Capital Contribution or Loan "for purposes of assessing liability, legal defenses, or in calculating any damages award." In rejecting Ameritech's new trial motion, the court noted that Ameritech itself had "crafted this curative instruction." And the court was "satisfied that this Instruction did its job of curing any prejudice

occasioned by [D]efense [C]ounsel's occasional forays outside the boundaries of the Court's ruling[s]." "We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the [party]." *State v. Raheem*, 2024 UT App 29, ¶ 66, 546 P.3d 331 (quotation simplified), *cert. denied*, 550 P.3d 997 (Utah 2024); *see also State v. Suhail*, 2023 UT App 15, ¶ 142, 525 P.3d 550 (noting that "curative instructions are ordinarily presumed on appeal to be effective, absent a substantial and prejudicial underlying error or irregularity" (quotation simplified)), *cert. denied*, 531 P.3d 730 (Utah 2023).

¶59    Finally, like the district court, we believe that, even without the impermissible tethering evidence, the jury had an evidentiary basis from which to conclude that Ameritech had not established that any improper conduct caused damages. As noted, although the jury concluded that Aiken and Hansen had committed some of the alleged conduct,[4] the jury (through a special verdict form) specifically did not find that any of this conduct caused Ameritech's claimed damages. While Ameritech now argues that the jury's decision not to award damages could only have been explained by reliance on the impermissible tethering evidence, we note that the jury heard, as part of the permissible background evidence, that the College was in financial trouble and that Aiken stepped into her role of interim CEO when these financial woes were already present. The district court—which, again, was in an advantaged position from which to judge the effects of any impropriety on the verdict—also observed that there was "evidence" before the jury "that others acted wrongfully," and

---

4. As noted above, the jury found that Aiken had breached her fiduciary duties and engaged in fraudulent non-disclosure, negligent misrepresentation, and tortious interference, and that Aiken and Hansen had engaged in a civil conspiracy.

from all this, the court opined that the jury had a basis for concluding that the actions of those "others . . . were the more direct cause of the events leading up to and precipitating the takeover." And it thus concluded that the "isolated" violations that occurred after October 20 did not prejudice Ameritech.

¶60   In short, given that much of the underlying evidence was before the jury, the fact that the court issued a curative instruction, and the court's conclusion that evidence that was properly before the jury supported its decision not to award damages, and in light of the deference that is afforded to the district court in this area, we see no basis for reversing the court's decision to deny the request for a new trial on damages.

## II. Motion for Contempt

¶61   Ameritech alternatively asked the district court to hold Aiken and Hansen in contempt for Defense Counsel's conduct and, as a sanction, award Ameritech the full measure of damages that it had requested (over $10 million). The district court, however, was unpersuaded that Defense Counsel's actions "constitute[d] the type of violation to support a finding of contempt." Ameritech now challenges that denial on appeal, but we reject its arguments for largely the same reasons set forth above with respect to the new trial issue.

¶62   "As a general rule, in order to prove contempt for failure to comply with a court order it must be shown that the person cited for contempt knew what was required, had the ability to comply, and intentionally failed or refused to do so." *Clarke v. Clarke*, 2012 UT App 328, ¶ 24, 292 P.3d 76 (quotation simplified). In addition, "the person challenging the court's decision to hold someone in contempt must demonstrate that, viewed in the light most favorable to the trial court, the evidence was insufficient to support the court's decision." *Id.* (quotation simplified).

Once a court finds the existence of facts necessary to support a contempt sanction, the decision to hold a party in contempt of court rests within the sound discretion of the trial court and will not be disturbed on appeal unless the trial court's action is so unreasonable as to be classified as capricious and arbitrary, or a clear abuse of discretion.

*TKS Co-Pack Mfg., LLC v. Wilson*, 2024 UT App 87, ¶ 36, 552 P.3d 258 (quotation simplified).

¶63 As discussed, the district court concluded that there had been a lack of clarity about what was and was not permissible before October 20, and for purposes of the rule 59 analysis, we've declined to disturb that decision. We see no basis for treating the question any differently for purposes of the contempt issue. Since most of the alleged violations occurred prior to October 20— which was, in the district court's view, something of a demarcation point after which Defense Counsel had "clear notice . . . of what constituted a violation"— the district court had ample basis to conclude that Defense Counsel had not knowingly disobeyed a court order for those prior alleged violations.

¶64 This leaves the violations that occurred after October 20. But with respect to these violations, the district concluded that sanctions for contempt were not warranted. In challenging that conclusion on appeal, Ameritech cites several cases in which appellate courts affirmed decisions from district courts that imposed sanctions for contempt. *See, e.g.*, *Foreman v. Foreman*, 176 P.2d 144, 149–50 (Utah 1946); *State v. C.H.*, 2008 UT App 404U, para. 7; *Envirotech Corp. v. Callahan*, 872 P.2d 487, 497–99 (Utah Ct. App. 1994). In Ameritech's view, what's significant about these cases is that the district courts held parties in contempt and imposed sanctions for violating court orders. But in our view, what's just as significant about these cases is that appellate courts were affirming the district courts' decisions to use their discretion

and sanction a party for contempt. In this sense, these decisions can be seen as being grounded in the deference that appellate courts give to a district court's prerogative with respect to contempt rulings.

¶65 But what Ameritech is asking for here is something altogether different—namely, a decision from an appellate court holding that a district court was *required* to sanction a party for contempt, even though the district court itself considered the matter and concluded that the conduct in question did not rise to the level of contempt. We're aware of no case, and Ameritech has not pointed to one, in which an appellate court overruled a district court's decision to not hold a party in contempt. And in light of the circumstances discussed above—including the initial lack of clarity and then the "evolution" in the court's rulings, the fact that much of the evidence in question was going to be admitted anyway, and the issuance of a curative instruction—we cannot conclude that the district court's decision in this case was "so unreasonable as to be classified as capricious and arbitrary, or a clear abuse of discretion." *TKS Co-Pack Mfg.*, 2024 UT App 87, ¶ 36 (quotation simplified). We therefore reject this argument.

## CONCLUSION

¶66 For the reasons set forth above, we affirm the district court's decisions not to grant Ameritech a new trial or award sanctions for contempt.[5]

––––––––––

5. Aiken and Hansen filed a conditional cross-appeal arguing that if we concluded that Ameritech was entitled to either a new trial or sanctions for contempt, we should then review and reverse the court's conclusion that the tethering evidence was inadmissible. Because we rule in Aiken and Hansen's favor on both decisions, we need not reach the issue raised in the conditional cross-appeal.